19-238-cr
*United States of America v. Purcell*

# UNITED STATES COURT OF APPEALS
## FOR THE SECOND CIRCUIT

August Term, 2019

Argued: February 6, 2020     Decided: July 23, 2020

Docket No. 19-238-cr

UNITED STATES OF AMERICA,

*Appellee*,

— v. —

LAVELLOUS PURCELL, also known as King Casino, also known as Mike Hill,

*Defendant-Appellant*,

GLORIA PALMER, also known as Gloria Hearn,

*Defendant.**

---

* The Clerk of the Court is respectfully directed to amend the caption as set forth above.

B e f o r e:

POOLER, LYNCH and PARK, *Circuit Judges.*

———————

Defendant-Appellant Lavellous Purcell appeals from a judgment of the United States District Court for the Southern District of New York (Cote, *J.*), convicting him after a jury trial of five counts arising from his operation of a prostitution business and sentencing him to 216 months in prison. On appeal, Purcell argues that the warrants utilized by New York State authorities to obtain evidence from Purcell's Facebook account violated his Fourth Amendment rights, that the government failed to present sufficient evidence to support conviction on three of the counts of conviction, and that the district court erroneously admitted testimonial hearsay. We agree with Purcell that there is insufficient evidence of venue in the Southern District of New York to support his conviction for enticement to engage in unlawful sexual activity, in violation of 18 U.S.C. §§ 2422(a) and 2, but we reject his other claims. Accordingly, we AFFIRM the conviction on Counts Two, Three, Four, and Five, REVERSE the conviction on Count One, and REMAND for the dismissal of Count One and resentencing.

———————

SEBASTIAN SWETT, Assistant United States Attorney (Jane Kim, Anna M. Skotko, Assistant United States Attorneys, *on the brief*), *for* Audrey Strauss, United States Attorney for the Southern District of New York, New York, NY, *for Appellee.*

YUANCHUNG LEE, Federal Defenders of New York, Inc., Appeals Bureau, New York, NY, *for Defendant-Appellant.*

———————

GERARD E. LYNCH, *Circuit Judge*:

Defendant-Appellant Lavellous Purcell[1] oversaw and operated a commercial sex business from approximately 2012 through 2017. At trial, the government relied extensively on evidence that had been seized from Purcell's Facebook account pursuant to warrants obtained by the New York County District Attorney's Office. Following a jury trial, Purcell was convicted in the United States District Court for the Southern District of New York (Denise L. Cote, *J.*) of five charges related to interstate sex trafficking: enticement to engage in unlawful sexual activity, in violation of 18 U.S.C. §§ 2422(a) and 2 (Count One); transporting individuals in interstate commerce to engage in prostitution, in violation of 18 U.S.C. §§ 2421(a) and 2 (Count Two); using facilities of interstate commerce to promote unlawful activity, in violation of 18 U.S.C. §§ 1952(a)(3) and 2 (Count Three); conspiring to use interstate commerce to promote unlawful activity, in violation of 18 U.S.C. § 371 (Count Four); and sex trafficking by force, fraud, and coercion, in violation of 18 U.S.C. §§ 1591(a)(1), (a)(2) and 2 (Count Five).

---

[1] The indictment spelled Purcell's first name "Lavelleous," but Purcell's brief states that the correct spelling is "Lavellous." *See* App'x 22; Appellant's Br at 3 n.1.

On appeal, Purcell challenges his conviction by arguing that the district court should have granted his motion to suppress the evidence seized from his Facebook account because the warrants were defective. He also challenges the sufficiency of the evidence on Counts One (as to venue and enticement), Two (as to whether he transported the relevant victim), and Five (as to coercion). Finally, he argues further that his conviction on Count Five was based in part on testimony that was erroneously admitted in violation of a pretrial agreement, the Federal Rules of Evidence, and the Confrontation Clause of the Sixth Amendment.

We conclude that district court properly denied Purcell's motion to suppress the evidence seized from his Facebook account, because even if the warrants authorizing seizure of that evidence were defective, the officers who collected and reviewed the evidence reasonably relied on them in good faith. We further conclude that the government presented sufficient evidence to permit a reasonable jury to find Purcell guilty on Counts Two and Five, and that the testimony that Purcell challenges was properly admitted non-hearsay. We also conclude, however, that the government failed to present sufficient evidence of venue in the Southern District of New York with respect to Count One, which

4

charged Purcell with enticement to engage in unlawful sexual activity. Accordingly, we REVERSE the conviction on Count One, AFFIRM the convictions on all other counts, and REMAND to the district court for dismissal of Count One and resentencing.

## BACKGROUND

### I.    Factual Background

The evidence presented at trial, "viewed in the light most favorable to the jury's verdict," *see United States v. Facen*, 812 F.3d 280, 287 (2d Cir. 2016), established that from 2012 through 2017, Lavellous Purcell oversaw and operated a commercial sex business. In the course of that business, Purcell recruited women from across the United States to work as prostitutes. Purcell contacted women, many of whom he did not know and some of whom did not have prior experience with prostitution, through private messages on Facebook, Instagram, and dating applications such as Tinder, requesting their phone numbers and sometimes identifying himself as a "pimp." App'x 708. He also contacted women who were already working as prostitutes through Backpage, a website that advertises commercial sex to potential customers, and attempted to persuade those women to "choose up" – a term in the commercial sex industry for a

5

prostitute's selection of a pimp – with him. *Id*. at 261. To facilitate his recruitment efforts, Purcell represented to some women that he would buy them houses or apartments if they worked for him. In other cases, he represented to women that by working for him they could make as much as $100,000 in less than one year.

Women who worked for Purcell were routinely asked to travel around the country to perform commercial sex. Purcell, who throughout the relevant period resided primarily in the town of Hempstead, on Long Island, New York, also traveled extensively to promote and manage his business. He often traveled in rental cars, in some cases driving as much as six thousand miles in a month. Women who worked for Purcell sometimes accompanied him on trips around the country. Gloria Palmer, Purcell's cousin and co-defendant, worked in the hotel industry and reserved discounted hotel rooms for Purcell and the women who worked for him.[2]

The evidence at trial demonstrated that Purcell and the women who worked for him traveled to at least fourteen states – Alabama, Arizona, California, Colorado, Connecticut, Florida, Nevada, New York, North Carolina,

---

[2] Palmer pleaded guilty to one count of conspiracy to use interstate commerce to promote unlawful activity, in violation of 18 U.S.C. § 371, and was sentenced principally to three years of probation and restitution in the amount of $18,500.

Pennsylvania, Tennessee, Texas, Utah, and Virginia – in connection with Purcell's prostitution business. Purcell promoted his business primarily through advertisements on the website Backpage, depicting scantily or provocatively dressed women, making euphemistic promises of "pleasure" and "satisfaction," and providing links that customers could use to make appointments with the women pictured. *Id*. at 693.

Purcell required the women who worked for him to abide by a number of "rules." *Id*. at 500. He expected the women to avoid relationships and interactions with other men (other than in the performance of commercial sex work), to have sex with him, to keep him apprised of all places they traveled to and all money they spent, and to give him any money that they earned. Purcell held the women's cell phones while they were in his company. The women who worked for him were to call him "Daddy," and some of them received neck tattoos of the word "Casino," a reference to Purcell's "pimp" alias, "King Casino." *Id*. at 273-74, 494.

Purcell sometimes used threatening language and violence in interactions with women who worked for him. He hit one woman for turning over less than all of the money customers had paid her for her services. In various Facebook

7

posts and private messages, Purcell referred to the use of violence to "break" the women who worked for him, *id*. at 242-43, suggested that he had "slapped" (but not "beat[en]") one such woman, *id*. at 238, and reminisced about grabbing another by the neck. After one woman fled the hotel to which Purcell had brought her to engage in prostitution, Purcell sent her a text message threatening to "kill [her] fat nasty ass." *Id*. at 329. A witness who frequently spoke with Purcell by phone while he drove between cities testified that she often overheard him yelling and cursing at women who were in the car.

The facts with respect to four alleged victims – each of whom either worked for Purcell as a prostitute or was the subject of his recruitment efforts – are of particular relevance to Purcell's arguments on appeal.

**A. Marie Ann Wood (Count Five)**

Marie Ann Wood, who testified at trial, spent three days with Purcell in December 2012, when she was about 25 years old. During that time she engaged in sex with a customer, before fleeing from the hotel at which she, Purcell, and two other prostitutes were staying and working.

Wood had worked as a prostitute in California before meeting Purcell. In late November or early December 2012, she traveled alone to New York to work

8

as a prostitute there, while Robert, her pimp, remained in California. She did not know anyone in New York City. She moved into a hotel near LaGuardia Airport and posted advertisements on Backpage to attract customers.

Purcell contacted Wood in response to her advertisement. On approximately December 19, 2012, Purcell went to her hotel room to discuss the possibility of his becoming her pimp.  Purcell told Wood "that this was his city and [she] should not be alone." *Id*. at 261. She testified that she did "choose up" with Purcell, meaning that she "was going to go from [her current] pimp to be [Purcell's] prostitute." *Id*. She testified that she felt she had little or no choice in the matter, because Purcell's presence, alone with her in a hotel room, was intimidating. Wood retrieved $800 in cash from under a lamp and gave it to Purcell. She testified that she felt "[o]bligated" to give him any cash she had because she had never before been confronted with "a pimp in [her] face that [she] had] never met." *Id*. at 262.

Purcell, unprompted, took Wood's bags from the hotel room closet, said "[l]et[']s go," *id*., and led Wood out of the hotel room. Wood followed. She testified that she did not want to go but that she felt that she had no choice, because she believed that Purcell "might have harmed" her if she had refused to

9

follow him. *Id*. at 263. Wood checked out of the hotel, retrieved a cash deposit she had previously paid, and gave that cash to Purcell. Outside the hotel, two women were waiting in Purcell's car, one in the driver's seat. Wood and Purcell got into the back seat, and the four of them drove off.

In the car, Purcell asked Wood for the phone number of Robert, the pimp with whom Wood worked. She gave him the number, and Purcell called Robert and informed him that Wood now worked for him. He then instructed Wood to call her cellular provider and change her phone number, so that Robert could not contact her. She did as instructed. The request frightened Wood because she believed that Purcell's actual intention was to make communication with her family and other personal contacts more difficult. No pimp had ever asked her to change her phone number before. Purcell also took possession of Wood's phone, which he held for the majority of her time in his company.

When the group stopped at a restaurant, Purcell, Wood, and the other two women sat together in a booth, and Purcell ordered everyone's food. As Purcell listened, the women explained Purcell's rules for the prostitutes who worked for him: that they dress in feminine attire and avoid loose-fitting clothes, refer to Purcell as "Daddy," and avoid speaking to or making eye contact with men other

10

than Purcell. Wood had not previously encountered a pimp who imposed so many rules on the prostitutes who worked for him.

One of the women had a neck tattoo of the word "Casino" in black ink, a reference to Purcell's pimp alias, "King Casino." She said that Wood and the other woman would soon be getting "Casino" neck tattoos of their own. Purcell himself reiterated to Wood that he expected her to obtain a "Casino" tattoo. Wood testified that she understood the tattoos to be a form of branding.

The group spent the night at Purcell's house in Hempstead, so that Purcell could meet his parole officer there the following morning. When Wood asked to use the bathroom, Purcell directed her to leave the door ajar. The next morning, Purcell, Wood, and the other two prostitutes drove six hours to State College, Pennsylvania. Wood drove for a portion of the trip, at Purcell's direction. She intentionally exceeded the speed limit, hoping that their car would be pulled over by police and that the ensuing encounter might facilitate her escape from Purcell's company, but they were not stopped.

Upon arriving at a hotel in State College, the party booked two adjacent rooms: one in which they would stay, and the other to be used for prostitution "dates." Purcell posted prostitution advertisements for the three women on

11

Backpage. He returned Wood's phone to her, so that she could answer incoming calls in response to the Backpage posting. Wood set up a "date" with a caller, who met her at the hotel. Wood and the customer had intercourse and oral sex, for which the customer paid $150, plus a $50 tip. After the customer left, Wood gave all of the money to Purcell.

After her "date" with the customer, Wood asked Purcell for permission to take a bath. He acceded, but again instructed her to leave the bathroom door ajar. After her bath, Wood resumed answering calls in response to the Backpage advertisements. Each of the other two women had a date with a customer that evening; Wood did not have another date. At one point, Wood informed Purcell that she had a scheduled court appearance and a funeral to attend in the coming weeks – fictitious commitments that she invented "to try to get him to let [her] leave." *Id*. at 313. Purcell replied that he would accompany her to those appointments. Purcell later stated that if Wood brought in $1000 from prostitution, he would consider allowing her to go without him, but Wood did not believe him. That night, before the women went to bed, Purcell collected their phones, turned them off, and slept with them. He slept on the floor next to the bed in which Wood slept.

The next morning, December 21, 2012, the four relocated to the "date room" while their other room was cleaned. *Id*. at 322. Purcell redistributed the women's phones so that they could answer calls from potential customers. Wood asked Purcell for permission to retrieve her makeup from her bag in the other room, in which they had slept. Once in the other room, alone, she called Robert, her former pimp, and asked why he had allowed her to be "taken" by another pimp. *Id*. at 323. She then called her sister, to report that she was with a new pimp who had required her to change her phone number. Wood testified that neither call lasted more than one minute, because she was afraid of being overheard or discovered making calls and feared that if she were discovered, Purcell and the others "would react in a harmful way." *Id*. at 324.

Wood returned to the "date room" and began readying herself for a date with a customer. Purcell announced that he and one of the other two women were leaving to get pizza, and he instructed the woman staying behind to "keep an eye on" Wood. *Id*. at 325. Wood was skeptical that Purcell would let her out of his sight and suspected that he might lurk in the parking lot as a "test," to see if she would try to leave. *Id*. After Purcell and the woman left, Wood told the remaining woman that she needed to retrieve something from her bag in the

13

other room. Wood entered the adjacent room and grabbed what she could find of her belongings, including a pair of boots. She ran out of the hotel room, down the stairs, and out of the hotel into the "freezing cold," barefoot. *Id*. at 326. Once on the street, she put on the boots and continued running for several minutes. She ran over to a man standing next to a Jeep and begged him for help; he drove her to a nearby police station. There, she told the police, "I'm a prostitute, I'm running for my life, and I need help." *Id*. at 327. Wood was interviewed by two police officers.

While at the police station, Wood received phone calls and text messages from Purcell and one of the other two prostitutes. One text, sent from Purcell's phone, read: "Imma kill your fat nasty ass bitch you betta get away from my city." *Id*. at 329. Wood did not see or communicate with Purcell again.

**B. Sharon Alwell (Count One)**

Sharon Alwell, approximately 49 years old at the time, corresponded with Purcell regularly over the course of several weeks in 2016, during which time Purcell attempted to persuade her to work for him as a prostitute. Alwell spent one weekend in Purcell's company in June 2016, during which Purcell advertised her services as a prostitute but she did not engage in commercial sex work.

14

Alwell, a single mother, had recently lost her apartment in Manhattan and moved, with her two children, into one bedroom of a two-bedroom apartment (shared with a roommate) in Rockaway, Queens. She sold toys in Coney Island, Brooklyn, to earn money.

Alwell met Purcell through the dating application Tinder. Alwell "swipe[d] right," indicating interest, when presented with Purcell's profile, which listed his profession as "adult entertainment." *Id*. at 494-95. Purcell contacted Alwell through the application; they exchanged messages, in which he asked for her phone number and she gave it to him. He began calling her daily. Purcell told Alwell that he was a pimp, and they regularly discussed his work. He often called her from cars while traveling between different cities and states. Over the phone, Alwell often heard Purcell yelling and cursing at the women who were traveling with him, though he took a gentler tone when speaking to her. Alwell told Purcell about her living situation and financial struggles.

After a few weeks of frequent phone conversations, Purcell suggested to Alwell that she work for him as a prostitute. Purcell told Alwell that if she worked for him, he would get her an apartment in New York, where she could live for free with her children, and that Purcell would stay there when he was in

15

town. He explained to her certain of his "rules": that he would keep all money that she earned through prostitution, that she would need to call him "Daddy," and that he would have sex with her. He wavered as to whether Alwell would be permitted to have a boyfriend, at one point telling her that she could not, and at another point indicating that she could because she was older and more mature than the other prostitutes who worked for him.

Purcell asked Alwell to meet him in Tennessee, where he purportedly needed a prostitute due to another woman's departure, and instructed her to buy her own ticket there to demonstrate her commitment to working for him. Alwell told Purcell that because of her children she could not leave New York. Instead, she agreed to spend a weekend with Purcell when he returned to New York.

On a Friday evening, Purcell picked Alwell up by car at her residence in Rockaway and drove her to a rundown house in Hempstead that he said belonged to his aunt. Alwell testified that upon seeing the poor condition of the house, she doubted the reliability of Purcell's promises to get her an apartment and financially provide for her and her children, and she decided that she did not want to engage in prostitution. Purcell took Alwell's cell phone, perused her photographs, and picked out some to use in a Backpage advertisement. Alwell

16

received twenty or thirty calls from potential customers that evening, but she deliberately avoided setting up any dates, dodging some calls and making excuses on others. Purcell apparently did not notice: according to Alwell, he spent much of the evening on the phone with another prostitute, who was going to be joining him the next day.

The next day, Purcell came and went from the house while Alwell continued to avoid making dates with callers. She eventually set up one date, out of concern that she would anger Purcell if she earned no money for him all weekend. Purcell drove Alwell to the address provided by the customer, about twenty minutes away, but no one answered the door. The next morning, Purcell drove Alwell home to Rockaway. He told Alwell that he thought she would be more successful at booking dates at another location, and he suggested bringing her to Atlantic City and Pennsylvania. Purcell continued to call Alwell periodically to discuss opportunities for her to work as a prostitute, but she did not meet him again or engage in prostitution for him.

**C. Samantha Vasquez (Counts One and Two)**

Samantha Vasquez did not testify at trial. The government presented documentary evidence indicating that she worked as a prostitute for Purcell over

a period of time that included November 2016 through June 2017. That evidence

included Facebook messages between Purcell and Gloria Palmer, his cousin and

co-defendant, in which they discussed hotel reservations and rates for Vasquez,

hotel records corroborating her stays in various places, and Backpage

advertisements offering her services as "Mistress Gisela." *Id*. at 726.

- In one message, dated November 9, 2016, Purcell wrote, "Samantha Vasquez, $109 Brooklyn. . . . Book for tomorrow." Palmer responded "Okay." *Id*. at 722. The message matched a receipt from the New York Marriott Brooklyn reflecting a booking for November 9-10, 2016 in the name of Samantha Vasquez, with an address in Hempstead, New York,[3] and a rate of $109.

- In another Facebook exchange between Purcell and Palmer, dated December 9, 2016, Purcell wrote: "Raleigh, North Carolina. Samantha Vasquez. December 12 through 14[]." *Id*. at 723. Palmer responded with the name and address of a hotel described as "4.1 miles from Raleigh," and "the cheapest. It's 45." *Id*. Purcell wrote back: "Book it," and Palmer replied: "Did it." *Id*. A Backpage advertisement, posted on December 13, 2016 and directed to the "Raleigh-Durham" market, referred to the woman depicted as "Gisela." *Id*. at 724.

- In another Facebook message exchange from December 9, 2016, either Palmer or Purcell wrote "Virginia Beach, December 14 to 16." *Id*. at 724. Palmer wrote: "So for VA for Samantha, book for Samantha only, not you." Purcell replied: "Both of us." *Id*. at 725. A Backpage advertisement from

---

[3] At trial, the government represented that the address listed on this receipt, as well as receipts discussed below from hotels in Phoenix, Arizona and Irvine, California, is the address of Purcell's aunt's house. There is no record evidence to suggest that Vasquez actually resided at that address.

December 15, 2016, targeted to the "Newton Road South, Virginia Beach" market, advertises the services of "Mistress Gisela." *Id*. at 725-26.

- In yet another December 9, 2016 Facebook message to Palmer, Purcell wrote: "I need two rooms on December 16 through 18. San Jose CA. Cheapest you see, two different locations." *Id*. at 726. Palmer responded: "Okay. Both are done. Yours 35, hers 45." *Id*. A Backpage advertisement from December 17, 2016, targeted at the geographic market "San Jose, South Bay," advertised "Mistress Gisela." *Id*. at 726-27.

- Hotel receipts from the Courtyard Marriott Phoenix, for January 18-19, 2017, and for the Residence Inn Marriott in Irvine, California, for February 17-20, 2017, listed the name "Samantha Vasquez" and the same address in Hempstead, New York, as the Brooklyn Marriott receipt. Backpage advertisements advertising "Mistress Gisela" appeared on January 19, 2017, targeted at the Phoenix market, and on February 19, 2017, targeted at the Orange County market. *Id*. at 728.

In addition to the above, the evidence included Facebook posts from Purcell's account in which he discussed his prostitution business and tagged a Facebook user named "Samantha Vazquez" [sic]. In a post dated May 1, 2017, Purcell congratulated Vasquez for having "maintained a high level of quality hoing" and for her "loyalty." *Id*. at 245. In a May 18, 2017 post, Purcell indicated that he was "[a]rriving at my lady of the night @Samantha Vazquez hotel room." *Id*. at 244. And on June 1, 2017, Purcell posted a photo that he claimed was the interior of Vasquez's new house, stated that he was "very proud of her hoing and loyalty to my pimping," and suggested that "it only took her six months" of

19

working with Purcell to acquire the home. *Id*. at 243-44.

**D. Stephanie Alcantara (Count One)**

Stephanie Alcantara, a detective with the Charlotte-Mecklenburg Police Department in Charlotte, North Carolina, described an undercover meeting with Purcell on July 19, 2017.

In or around July 2017, local police received a tip that Purcell was recruiting prostitutes and promoting prostitution in the Charlotte region. Alcantara contacted Purcell, posing as a potential prostitute, and expressed interest in working with him. They met on July 19, 2017, at an IHOP restaurant in Charlotte.[4] Alcantara represented to Purcell that she had tried prostitution previously, "a while ago," but had stopped when her pimp treated her violently. Supp. App'x 43. Purcell explained some of his rules, including that the prostitutes who worked for him could not have boyfriends and were required to give him all money they earned. Purcell inquired whether Alcantara could travel for the job. She said that she could. Purcell stated: "I live in Vegas but, I . . . [t]ravel the

---

[4] Purcell's personal calendar indicates that he stayed at the Long Island Marriott in Uniondale, New York from July 17 to 19, 2017. On the basis of that calendar entry and rental car receipts, the government posits that Purcell drove from Long Island to Charlotte on July 19, 2017.

world. I'm back on the East Coast." *Id*. at 49. Alcantara testified that she understood Purcell's statement to mean that he intended for her to work as a prostitute internationally and throughout the United States, including in New York City.

## II. Procedural Background

### A. Warrants

Law enforcement officers seized data from Purcell's Facebook account, which used the alias "Mike Hill," pursuant to four warrants. The first three warrants were obtained by the New York County District Attorney's Office ("DANY"), and the fourth by the United States Attorney's Office for the Southern District of New York.

#### 1. *August 2016 Warrant*

In August 2016, the DANY applied for a search warrant that would authorize it to search the "Mike Hill" Facebook account and an additional Facebook account, the "Tasha Monroe" account, that it believed was also affiliated with Purcell's prostitution business. In support of its application, the DANY submitted an affidavit by Senior Investigator Ariela DaSilva. The affidavit stated that there was "reasonable cause to believe that evidence of the

21

commission of the crime of Promoting Prostitution in the third Degree, P.L. §230.25, Prostitution, P.L. §230.00 and an attempt or conspiracy to commit those crimes, and related crimes, will be found in" enumerated aspects of the target Facebook accounts. App'x 46.

The affidavit listed twenty-four aspects of the Facebook accounts to be searched and seized, including subscriber information and contact information; a user "neo-print" including historical log-in data and postings made to the target accounts; a "photo-print" including both saved and deleted photographs posted by the target accounts' users, photographs in which the target accounts were tagged, and all associated metadata; "[a]ny public or private messages"; "IP logs"; "[a]ll chat history, including . . . content of all chats and date and time information"; and "[a]ll [s]earches data." *Id*. at 46-47.

The affidavit described DaSilva's experience investigating sex trafficking and prostitution rings, including her familiarity with the use of Facebook for the recruitment of prostitutes and the promotion of prostitution businesses. The affidavit also gave examples of public posts from the target accounts to support the reasonableness of the officers' belief that the enumerated aspects of those accounts would contain evidence of the specified prostitution-related offenses.

22

These included posts to the "Mike Hill" account in which Purcell repeatedly referred to himself as a "[p]imp" and discussed women (referred to as "bitch[es]") earning money for him and "sell[ing] [them]sel[ves] for" him. *Id*. at 50-52.

On August 5, 2016, a New York state judge signed a search warrant ("August 2016 Warrant") for the "Mike Hill" and "Tasha Monroe" Facebook accounts. The warrant stated that there was probable cause to believe that enumerated aspects of the accounts – the same twenty-four categories of Facebook data listed in the affidavit – "tend[] to demonstrate that an offense was committed." *Id*. at 58. The warrant did not specify the suspected offense. The warrant was temporally limited with respect to the Monroe account, but not with respect to the Hill account. The warrant did not incorporate DaSilva's affidavit.

The August 2016 Warrant stated that it "hereby authorize[d] law enforcement to seize, search, obtain, retrieve, and view all the data, information, and images provided to them by Facebook, Inc.," but that "[n]otwithstanding this authorization, the warrant/order is deemed 'executed' when it is served upon Facebook, Inc. . . ., and subsequent review is deemed analysis." *Id*. It also authorized "Facebook, Inc. . . . to conduct the search/records check of its own

23

records and computer systems, and to provide the results to the New York City Police Department or the New York County District Attorney's Office, in a format convenient for law enforcement. Members of the New York City Police Department or the New York County District Attorney's Office or other law enforcement personnel are not required to be present while this search/records check is conducted by Facebook, Inc." *Id*. at 58-59.

In response to the warrant, Facebook, Inc. produced records for the Hill account for a limited time period and did not comply with the DANY's subsequent request that it produce all requested records.

2. *November 2016 Warrant*

The DANY obtained a second search warrant for the "Mike Hill" Facebook account on November 1, 2016 ("November 2016 Warrant"). The DANY's application for the warrant incorporated the same affidavit from DaSilva that had initially been submitted in connection with the August 2016 Warrant application. The application for the November 2016 Warrant did not rely on any information obtained in response to the August 2016 Warrant.

The November 2016 Warrant stated that there was "reasonable cause to believe that" the twenty-four enumerated categories of Facebook data

"constitute[] evidence and tend[] to demonstrate that an offense was committed, including, but not limited to Promoting Prostitution in the Third Degree, P.L. §230.25, Prostitution, P.L. §230.00, and an attempt or conspiracy to commit those crimes." *Id*. at 82. The warrant did not contain a temporal limitation. Using the same language as the August 2016 Warrant, it purported to authorize Facebook, Inc. to "conduct the search/records check of its own records and computer systems, and to provide the results to" law enforcement, without requiring the presence of law enforcement during that search, and stated that it would be "deemed 'executed' when it is served upon Facebook, Inc.," with "subsequent review . . . deemed analysis." *Id*. at 83.

The information produced by Facebook, Inc. in response to the November 2016 Warrant included all information that had previously been produced in the response to the August 2016 Warrant. Thus, Facebook, Inc.'s response to the November 2016 Warrant rendered the previously produced evidence redundant.

### 3. *September 2017 Warrant*

The DANY obtained a third search warrant for the "Mike Hill" Facebook account on September 26, 2017 ("September 2017 Warrant"). Like its application for the November 2016 Warrant, the DANY's application for the September 2017

Warrant incorporated DaSilva's original affidavit by reference. The application also described subsequent posts on the target account that suggested it was being used to recruit "numerous female individuals . . . to come work in prostitution." *Id*. at 89.

The September 2017 Warrant stated that there was probable cause to believe that the target Facebook account contained evidence that "an offense" had been committed, but it did not specifically identify the offense. *Id*. at 109-10. The warrant did not contain a temporal limitation. It used the same language as the August 2016 and November 2016 warrants in authorizing Facebook, Inc. to search its own records, without law enforcement present, and provide the results to law enforcement, and in providing that the warrant would be "deemed 'executed'" when served on Facebook, Inc., with "subsequent review" categorized as "analysis." *Id*. at 110.

4. *August 2018 Warrant*

On August 22, 2018, while Purcell's motion to suppress evidence obtained pursuant to the three prior warrants was pending, Judge Cote of the United States District Court of the Southern District of New York issued a search warrant for the "Mike Hill" Facebook account, pursuant to an application filed by federal

prosecutors. This warrant identified specific federal offenses, evidence of which the authorities had reason to believe was contained in the target account. The government produced the August 2018 Warrant to Purcell on August 22, 2019, and it produced the warrant returns to him on September 21, 2019, several months after his conviction, sentencing, and timely notice of appeal.

**B. Pretrial Procedure**

In July 2017, the DANY brought Purcell's case to the U.S. Attorney for the Southern District of New York for joint investigation. A federal grand jury indicted Purcell on January 31, 2018 on five counts related to the promotion of prostitution. Purcell was arrested eight days later.

On August 7, 2018, Purcell moved to suppress evidence from the "Mike Hill" account provided by Facebook, Inc. in response to the August 2016, November 2016, and September 2017 warrants. Purcell argued that all three warrants were defective because they were not sufficiently particularized, in violation of the Fourth Amendment. The government opposed the motion to suppress with respect to evidence obtained pursuant to the November 2016 and September 2017 warrants, but disclaimed reliance on the August 2016 Warrant. On September 13, 2018, the district court denied Purcell's motion. The district

27

court concluded that the November 2016 Warrant was adequately particularized and that officers' reliance on the September 2017 Warrant was objectively reasonable.

Prior to trial, the government moved in limine for a ruling on the admissibility of statements made by Wood to the State College Police Department on December 21, 2012. Purcell opposed their admission. After the district court urged the parties to reach an agreement, the government informed the district court that the parties agreed that Wood's initial statements to the intake officer at the police station would be admissible under the "excited utterance" exception to the hearsay doctrine, *see* FED. R. EVID. 803(2), but that the government would not seek to introduce statements made by Wood during the course of her police interview.

**C. Trial and Sentencing**

Purcell's jury trial began on October 15, 2018 and ended on October 19, 2018. The government's evidence at trial included status updates and video posts from the "Mike Hill" Facebook account, which had been posted in a manner that made them accessible to any person with Facebook access. The government also introduced twenty-five private message conversations from the "Mike Hill"

28

Facebook account, seventeen of which had been obtained in response to the November 2016 Warrant. Wood, Alwell, and Alcantara were among the witnesses called by the government. Purcell did not call any witnesses.

On direct examination of Wood, the government did not seek to elicit testimony regarding the statements that Wood made in her interview with State College police on December 21, 2012. On cross-examination of Wood, however, defense counsel repeatedly questioned Wood about statements made in that interview. Defense counsel highlighted apparent discrepancies between Wood's statements to the State College police and her direct examination testimony at trial, including that her statements to the police omitted any mention of her former pimp and omitted the fact that, in her initial interaction with Purcell in her hotel room, she gave him all cash she had on hand as a "choosing fee." App'x 338, 342-43. Defense counsel asked Wood questions suggesting that certain of her statements to the State College police were "not a fair summary of what actually happened," *id*. at 347, that she "didn't want to tell the State College Police Department about [her] full involvement" with Purcell, *id*. at 349, that she "withheld some information from" the police, *id*. at 349-50, and that the information she provided to the police was "edited," *id*. at 350.

29

The government subsequently called Officer Heather Royer of the State College Police Department as a witness. On direct examination, Royer, one of the officers who interviewed Wood on December 21, 2012, recounted in detail Wood's statements in her police interview. Defense counsel did not object to any aspect of Royer's testimony.

At the end of the trial, the jury found Purcell guilty on all five counts. On Count One, the jury convicted Purcell of enticing three victims – Alwell, Vasquez, and Alcantara – to engage in unlawful sexual activity, in violation of 18 U.S.C. §§ 2422(a) and 2.[5] On Count Two, the jury convicted Purcell of transporting one victim, Vasquez, in interstate commerce to engage in prostitution, in violation of 18 U.S.C. §§ 2421(a) and 2.[6] On Count Three, the jury convicted Purcell of using interstate commerce to promote unlawful activity, in violation of 18 U.S.C. §§ 1952(a)(3) and 2. On Count Four, the jury convicted Purcell of conspiracy to use interstate commerce to promote unlawful activity, in violation of 18 U.S.C.

---

[5] The verdict form required a special verdict from the jury with respect to each of the three victims named in Count One.

[6] The verdict form required a special verdict as to each of two victims named in Count Two. The jury found that Purcell was not guilty on Count Two with respect to Alwell.

§ 371. On Count Five, the jury convicted Purcell of sex trafficking one victim, Wood, by force, fraud, and coercion, in violation of 18 U.S.C. §§ 1591(a)(1), (a)(2), and 2.[7]

Purcell's conviction on Count Five carried a mandatory minimum sentence of fifteen years' imprisonment. 18 U.S.C. § 1591(b)(1). The district court found that the applicable U.S. Sentencing Guidelines range for all of the charges was 188 to 235 months. On January 22, 2019, the district court sentenced Purcell to 216 months in prison, five years of supervised release, $138,250 in restitution, and a $500 mandatory special assessment.

## DISCUSSION

On appeal, Purcell raises three kinds of challenges to the judgment of conviction. First, he argues that the district court committed prejudicial error in denying his pretrial motion to suppress evidence obtained from Facebook, Inc. pursuant to the November 2016 and September 2017 search warrants. Second, he argues that his convictions on Counts One, Two, and Five of the indictment were not supported by sufficient evidence as to certain elements. Third, he argues that

---

[7] Again, the jury was asked for special verdicts with respect to two alleged victims. The jury found that Purcell was not guilty on Count Five with respect to alleged victim Kristen Prieur.

31

he is entitled to a new trial on Count Five because the district court's admission of Royer's testimony regarding Wood's statements to the State College Police Department constituted plain error.

As explained below, we conclude that the district court did not err in denying Purcell's motion to suppress the Facebook evidence or plainly err in admitting Royer's testimony, and we reject Purcell's challenges to the sufficiency of the evidence on Counts Two and Five. However, while we affirm in all other respects, we agree with Purcell that the government failed to establish sufficient evidence of venue on Count One and reverse that count of conviction on that basis.

## I. Challenges to the Search Warrants

Purcell's sole challenge going to the entire judgment of conviction is his claim that the district court erred in denying his pretrial motion to suppress the government's Facebook evidence, which he argues was obtained pursuant to defective warrants in violation of his Fourth Amendment rights.

Prior to trial, Purcell sought to suppress the Facebook evidence obtained pursuant to all three warrants acquired by the DANY: the August 2016 Warrant, November 2016 Warrant, and September 2017 Warrant. In response, the

32

government disclaimed reliance on the August 2016 Warrant, argued that the November 2016 Warrant complied with all constitutional requirements, and argued that the September 2017 Warrant, which it conceded was facially defective, was nonetheless subject to the good-faith exception to the exclusionary rule. The district court denied Purcell's motion to suppress evidence obtained from Facebook pursuant to the November 2016 and September 2017 warrants.

On appeal, Purcell argues that both the November 2016 and September 2017 warrants were insufficiently particularized.[8] As explained below, we reject Purcell's argument on the grounds that the officers' reliance on the disputed warrants was objectively reasonable, even assuming, without deciding,  that the warrants were facially unconstitutional.

**A. Legal Background**

"On appeal from a district court's ruling on a motion to suppress evidence, we review legal conclusions de novo and findings of fact for clear error." *United*

---

[8] Purcell also maintains that the August 2016 Warrant was constitutionally defective. The government, however, did not rely at trial on evidence obtained pursuant to the August 2016 Warrant; as a result, the district court treated Purcell's challenge to that warrant as moot and ruled on the suppression motion only with respect to the other two contested warrants. We do not understand Purcell to challenge that approach, and we similarly treat any challenge to the August 2016 Warrant as moot for the purposes of his appeal.

*States v. Bershchansky*, 788 F.3d 102, 108 (2d Cir. 2015) (internal quotation marks omitted). Mixed questions of law and fact are reviewed de novo. *Id.*

Under the Fourth Amendment, warrants may be issued only "upon probable cause, supported by Oath or affirmation, and particularly describing the place to be searched, and the persons or things to be seized." U.S. CONST. amend. IV. "The manifest purpose of this particularity requirement was to prevent general searches. By limiting the authorization to search to the specific areas and things for which there is probable cause to search, the requirement ensures that the search will be carefully tailored to its justifications, and will not take on the character of the wide-ranging exploratory searches the Framers intended to prohibit." *Maryland v. Garrison*, 480 U.S. 79, 84 (1987). "A failure to describe the items to be seized with as much particularity as the circumstances reasonably allow offends the Fourth Amendment because there is no assurance that the permitted invasion of a suspect's privacy and property are no more than absolutely necessary." *United States v. George*, 975 F.2d 72, 76 (2d Cir. 1992).

To satisfy the Fourth Amendment's particularity requirement, a warrant must meet three criteria: (1) it "must identify the specific offense for which the police have established probable cause"; (2) it "must describe the place to be

searched"; and (3) it "must specify the items to be seized by their relation to designated crimes." *United States v. Galpin*, 720 F.3d 436, 445-46 (2d Cir. 2013) (internal quotation marks omitted). A warrant is facially unconstitutional if it fails to comply with any of these requirements. Thus, for example, this Court has found that a warrant is insufficiently particularized when "[n]othing on the face of the warrant tells the searching officers for what crime the search is being undertaken," but rather the warrant authorizes officers to search for "evidence of a violation of a broad criminal statute or general criminal activity." *George*, 975 F.2d at 75-76 (internal quotation marks omitted). We have also found the particularity requirement to be violated where a warrant fails to place some "limitation . . . on the kind of evidence sought" and instead "le[aves] it entirely to the discretion of the officials conducting the search to decide what items [a]re to be seized." *United States v. Buck*, 813 F.2d 588, 592 (2d Cir. 1987) (internal quotation marks omitted).

Specificity in the application for a warrant does not cure facial deficiencies in the warrant itself. "The Fourth Amendment by its terms requires particularity in the warrant, not in the supporting documents." *Groh v. Ramirez*, 540 U.S. 551, 557 (2004). "Resort to an affidavit to remedy a warrant's lack of particularity is

only available when it is incorporated by reference in the warrant itself and attached to it." *George*, 975 F.2d at 76.

"[A] search warrant does not necessarily lack particularity simply because it is broad." *United States v. Ulbricht*, 858 F.3d 71, 100 (2d Cir. 2017). When, for example, "the criminal activity pervades [an] entire business, seizure of all records of the business is appropriate, and broad language used in warrants will not offend the particularity requirements." *U.S. Postal Serv. v. C.E.C. Servs.*, 869 F.2d 184, 187 (2d Cir. 1989). A warrant that comports with the particularity requirements may, however, be defective due to overbreadth. "[B]readth and particularity are related but distinct concepts." *Ulbricht*, 858 F.3d at 102. "[A]n otherwise unobjectionable description of the objects to be seized is defective if it is broader than can be justified by the probable cause upon which the warrant is based." *Galpin*, 720 F.3d at 446 (internal quotation marks omitted). Nevertheless, "in many cases, the volume of records properly subject to seizure because of their evidentiary value may be vast." *Ulbricht*, 858 F.3d at 100. This Court has found, for example, that "a broad warrant allowing the government to search [the defendant's] laptop for potentially extensive evidence of" charged crimes committed using that laptop "does not offend the Fourth Amendment, as long as

that warrant meets the three particularity criteria." *Id*. at 102-03.

Even when a search warrant is constitutionally defective, we bear in mind that "[s]uppression of evidence . . . has always been [a] last resort, not [a] first impulse." *Hudson v. Michigan*, 547 U.S. 586, 591 (2006). "To trigger the exclusionary rule, police conduct must be sufficiently deliberate that exclusion can meaningfully deter it, and sufficiently culpable that such deterrence is worth the price paid by the justice system." *Herring v. United States*, 555 U.S. 135, 144 (2009). Thus, evidence seized pursuant to a defective warrant will not be suppressed if it was "obtained in objectively reasonable reliance" on the invalid warrant. *United States v. Leon*, 468 U.S. 897, 922 (1984). "[W]hen an officer acting with objective good faith has obtained a search warrant from a judge or magistrate and acted within its scope," in most cases, "there is no police illegality and thus nothing to deter." *Id*. at 920-21. In such cases, "[p]enalizing the officer for the magistrate's error, rather than his own, cannot logically contribute to the deterrence of Fourth Amendment violations." *Id*. at 921. "[T]he exclusion of evidence is inappropriate when the government acts 'in objectively reasonable reliance' on a search warrant, even when the warrant is subsequently invalidated." *United States v. Ganias*, 824 F.3d 199, 221 (2d Cir. 2016) (quoting

*Leon*, 468 U.S. at 922).

Even so, "it is clear that in some circumstances the officer will have no reasonable grounds for believing that the warrant was properly issued." *Leon*, 468 U.S. at 922-23. The Supreme Court in *Leon* identified four circumstances in which the good-faith exception does not apply, thereby rendering the exclusion of evidence appropriate: "(1) where the issuing magistrate has been knowingly misled; (2) where the issuing magistrate wholly abandoned his or her judicial role; (3) where the application is so lacking in indicia of probable cause as to render reliance upon it unreasonable; and (4) where the warrant is so facially deficient that reliance upon it is unreasonable." *United States v. Moore*, 968 F.2d 216, 222 (2d Cir. 1992) (citing *Leon*, 468 U.S. at 923). We have previously found that the fourth of these grounds for exclusion – a "glaringly deficient warrant" that "[n]o reasonable officer" would presume valid – was met where the warrant did "not even arguably include a reference to the . . . alleged crimes or a temporal scope for the items to be seized." *In re 650 Fifth Ave. & Related Props.*, 934 F.3d 147, 163 (2d Cir. 2019).

Finally, even if we determine that the warrants were defective and that the good-faith exception does not apply, the erroneous admission of the evidence

38

seized pursuant to unconstitutional warrants must be reviewed under a harmless error standard. We will disturb the judgment of conviction on Fourth Amendment grounds only if we cannot "conclude beyond a reasonable doubt that a rational jury would have rendered a verdict of guilty absent the alleged error." *United States v. Dhinsa*, 243 F.3d 635, 649 (2d Cir. 2001). Thus, a defendant who seeks a new trial on the theory that his Fourth Amendment rights required the suppression of evidence "must surmount a series of hurdles: first establishing a constitutional violation, then demonstrating that the violation falls under the ambit of the exclusionary rule, and finally showing that the erroneously admitted evidence affected the outcome of the trial." *United States v. Cacace*, 796 F.3d 176, 188 (2d Cir. 2015).

**B. September 2017 Warrant**

The September 2017 Warrant's constitutional deficiency is not in dispute: that warrant, like the August 2016 Warrant on which the government disclaimed reliance, did not identify any specific offense for which probable cause existed. It therefore plainly failed to comply with an essential component of the particularity requirement of the Fourth Amendment. *See George*, 975 F.2d at 75-76. We conclude, however, that the district court correctly declined to suppress the

39

evidence seized pursuant to this warrant, because notwithstanding the warrant's

facial defect, the officers who executed the warrant relied on it in objectively

reasonable good faith.

Purcell argues that the September 2017 Warrant's defects were not limited

to its failure to identify the relevant offense with particularity. Specifically, he

contends that the warrant was both insufficiently particularized with respect to

the items to be searched and overbroad because, in authorizing the search and

seizure of twenty-four categories of evidence that, together, amount to virtually

all data associated with a Facebook account, it was the digital equivalent of a

prohibited general warrant. We disagree. The September 2017 Warrant was

unquestionably broad, but "[a] warrant may be broad, in that it authorizes the

government to search an identified location or object for a wide range of

potentially relevant material, without violating the particularity requirement."

*Ulbricht*, 858 F.3d at 102. While the warrant authorized officers to search and seize

an extensive list of categories of Facebook data, each of which potentially

encompassed a large volume of information, it identified the kinds of data subject

to seizure with specificity. It therefore set forth guidelines that limited "the kind

of evidence sought" and did not leave decisions over which data to seize

"entirely to the discretion of the officials conducting the search." *Buck*, 813 F.2d at

592 (internal quotation marks omitted). The September 2017 Warrant identified

the target Facebook account to be searched and the specific kinds of data from

that account to be seized. It was therefore adequately particularized and

justifiably broad with respect to both the location to be searched (the "Mike Hill"

Facebook account) and the items to be seized from that location (the twenty-four

enumerated categories of data).

Moreover, the September 2017 Warrant was not overbroad. Our case law

makes clear that warrants which authorize broad searches of both digital and

non-digital locations may be constitutional, so long as probable cause supports

the belief that the location to be searched – be it a drug dealer's home, an office's

file cabinets, or an individual's laptop – contains extensive evidence of suspected

crimes. *See Ulbricht*, 858 F.3d at 102-03. Here, the application materials for the

September 2017 Warrant established the basis for the DANY's belief that Purcell

used the "Mike Hill" Facebook account for both the recruitment of prostitutes

and the promotion of his prostitution business. Because there was reason to

believe that the suspected criminal activity "pervade[d] that entire" account,

"seizure of all records of the [account wa]s appropriate." *U.S. Postal Serv.*, 869

41

F.2d at 187. The warrant's scope was therefore justified by probable cause.

The September 2017 Warrant functioned in a non-traditional manner, in that it apparently was not contemplated that government agents would invade either the physical premises of Facebook or its computer servers to search for the "Mike Hill" account or any other evidence. Rather, it "authorize[d] Facebook, Inc. . . . to conduct the search/records check of its own records and computer systems, and to provide the results to" law enforcement, which was "not required to be present while this search/records check is conducted by Facebook, Inc." App'x 110-11. The warrant also stated that it would be "deemed 'executed' when it is served upon Facebook, Inc." and that "subsequent review is deemed analysis." *Id*. at 110. Thus, the "search" contemplated and authorized by the warrant was performed not by law enforcement, but rather by Facebook, Inc., a private third party in possession of the potential evidence, and the "seizure" was law enforcement's receipt of material handed over by Facebook, Inc. under the terms specified by the warrant. Accordingly, the September 2017 Warrant functioned as a hybrid between a warrant, in that it set forth terms for the search and seizure of evidence based on probable cause, and a subpoena, in that it directed a private third party to supply specified material to law enforcement to assist with its

42

investigation.

The warrant authorized and directed Facebook to turn over the specified categories of data from the specified account without exercising its own judgment about whether the data tended to demonstrate that any offense, let alone any particular offense, had been committed. Because probable cause supported the belief that the suspected criminal conduct relating to prostitution pervaded Purcell's use of the "Mike Hill" Facebook account, the DANY could "seize" data from the account, as specified in the warrant, without first perusing it to confirm that it constituted evidence. The DANY was therefore able to execute the warrant in a minimally invasive manner, by directing Facebook, Inc. to turn over the specified categories of data without the physical presence or supervision of law enforcement officers. Execution of the warrant did not require employees of Facebook, Inc. to personally cull the data for evidence of prostitution and trafficking, and there is nothing in the record to indicate that they searched in this manner. Nor were the officers required to determine whether the evidence provided by Facebook was probative of criminal conduct; they were entitled to seize it because it constituted the evidence demanded by the warrant.

Thus, the September 2017 Warrant's clear facial defect, its omission of the specific offense for which probable cause existed, does not appear to have given rise to a less particularized search and seizure of evidence. The warrant clearly set forth both the location to be searched and the items to be seized, leaving Facebook, Inc. without room to exercise discretion in collecting responsive material. Because the September 2017 Warrant called for Facebook, Inc. to turn over specified information without first culling the information itself, the scope of Facebook's "search" and its identification of the items to be seized were not tethered to its cognizance of the suspected criminal conduct. The DANY obtained the same data from the "Mike Hill" Facebook account that it would have obtained if the warrant had complied with the Fourth Amendment's particularity requirement by specifying the relevant offense.

Once Facebook complied with the warrant's terms, the warrant contemplated that law enforcement officers would conduct an "analysis" of the data they had seized. *Id.* at 110. In other words, once the DANY obtained the data from the "Mike Hill" Facebook account from Facebook, Inc., it was authorized to review the materials provided for evidence of prostitution and trafficking-related

offenses.[9] This was a review of evidence that had already been seized pursuant to the warrant's terms, and as such it was not directly dependent on those terms. Logic indicates, and the record does not contradict, that the officers who conducted this analysis included those already involved in the investigation into Purcell's suspected sex-trafficking offenses, who had also participated in the drafting of the warrant application materials. Thus, those officers were in all likelihood fully aware of the purpose and parameters of the investigation, and we have no reason to think that their analysis was affected by the warrant's failure to specify the suspected offense.

In short, under the unusual circumstances presented by this warrant, neither the officers who "executed" the warrant by serving it on Facebook, Inc., nor the Facebook, Inc. employees who searched the company's digital files to identify, collect, and provide to the authorities the specified components of the "Mike Hill" account, had any particular reason to consult the warrant to notice

---

[9] In that regard, the warrant was analogous to the familiar warrants that, after determining that there is probable cause to believe that various electronic devices to be found at a suspect's residence contain evidence of child pornography, direct the officers to search the residence and seize all computers, hard drives and other data storage devices. The warrant directs the agents to search for and seize the devices, which thereafter are examined to identify any contraband images or other relevant evidence that they might contain.

45

whether it did or did not identify the crimes expected to be evidenced by the account.

"Application of the exclusionary rule depends on the efficacy of the rule in deterring Fourth Amendment violations in the future, as well as a determination that the benefits of deterrence outweigh the costs." *United States v. Rosa*, 626 F.3d 56, 64 (2d Cir. 2010 (internal quotation marks and alteration omitted). In *Rosa*, this Court found that the exclusionary rule was not triggered, notwithstanding the warrant's insufficient particularity, because, under the circumstances of the case, "the officers acted reasonably" and "the exclusionary rule would serve little deterrent purpose." *Id*. at 65. We reached that conclusion largely because "unincorporated, unattached supporting documents," including the warrant application and accompanying affidavit by a police investigator, "ma[d]e clear that the purpose of the search was to obtain evidence of child pornography and child molestation." *Id*. at 64-65. We noted further that there was "no evidence that the team of officers searched for, or seized, any items that were unrelated to the crimes for which probable cause had been shown, or . . . somehow misled the town justice regarding the facts of the investigation and intended scope of the search." *Id*. at 65. Accordingly, we concluded that the defect in the warrant "was

simply an inadvertent error" and that, despite the defect, "the officers proceeded as though the limitations contemplated by the supporting documents were present in the warrant itself." *Id*. at 65, 66.

In this case, neither Facebook, Inc.'s performance of its obligations under the September 2017 Warrant nor the DANY's subsequent analysis of the seized evidence was directly guided by the warrant's specification of (or failure to specify) the suspected offense. Therefore, the warrant's omission of that specification did not broaden or otherwise affect the scope of the search and seizure. In this context, the structure of the warrant rendered the specification of the suspected offense, while constitutionally indispensable, functionally unnecessary. The warrant, a complicated and novel hybrid of a traditional warrant and a subpoena, operated in the intended manner, allowing officers to obtain only the items for which probable cause existed and to review them for evidence of specific suspected criminal activity. As in *Rosa*, the warrant's defect was an "inadvertent error," and all evidence indicates that "the officers acted reasonably" and "proceeded as though the limitations contemplated by the supporting documents were present in the warrant itself." *Id*. at 65-66. Under the circumstances, it was reasonable for officers to rely on the warrant,

47

notwithstanding its clear omission of an essential piece of information.

We do not suggest that the September 2017 Warrant met the requirements of the Fourth Amendment. On the contrary, "[w]here, as here, the property to be searched" is digital, "the particularity requirement assumes even greater importance." *Galpin*, 720 F.3d at 446. "A general search of electronic data is an especially potent threat to privacy," *Ulbricht*, 858 F.3d at 99, because the government's seizure and retention of digital information "can give the government possession of a vast trove of personal information about the person to whom the [data] belongs, much of which may be entirely irrelevant to the criminal investigation that led to the seizure," *Ganias*, 824 F.3d at 217. Even under circumstances, like these, in which the execution of the warrant does not specifically require the searching party to exercise discretion based upon its knowledge of the suspected crime, a warrant's "[m]ere reference to 'evidence' of a violation of a broad criminal statute or general criminal activity" "offends the Fourth Amendment because there is no assurance that the permitted invasion of a suspect's privacy and property are no more than absolutely necessary." *George*, 975 F.2d at 76.

Nevertheless, because all available evidence suggests that "the officers

acted reasonably" in executing the September 2017 Warrant, "the exclusionary rule would serve little deterrent purpose." *Rosa*, 626 F.3d at 65. The officers' conduct with respect to the warrant's defect, fundamental though that defect is, was neither "sufficiently deliberate that exclusion can meaningfully deter it" nor "sufficiently culpable that deterrence is worth" the costs of exclusion. *Herring*, 555 U.S. at 144. Under these circumstances, suppression of the evidence seized pursuant to the September 2017 Warrant would have "[p]enaliz[ed] the officer for the magistrate's error, rather than his own," and thus it would not "logically contribute to the deterrence of Fourth Amendment violations." *Leon*, 468 U.S. at 921.[10] We therefore affirm the district court's decision to deny Purcell's motion to

---

[10] *In re 650 Fifth Avenue* is not to the contrary. The warrant there, unlike the one at issue here, did not "particularize categories of computerized information [that] there was probable cause to seize." *In re 650 Fifth Ave. & Related Props.*, 830 F.3d 66, 100 (2d Cir. 2016) (internal quotation marks omitted). Rather, the officers were authorized and directed by the warrant to invade the premises of the suspected wrongdoer and search for and seize "[a]ny and all documents concerning or relating to financial books and records, bank accounts, disbursements, money transfers or employment records of [any of four different entities] or any of the officers and employees of these entities," and "[a]ny and all computers; central processing units; external and internal drives; external and internal storage equipment or media; computerized data storage devices; hard disks or floppy disks; CD-ROMs[;] ... and related or connected computer or data storage equipment located on the premises to be searched," *id.* (internal quotation marks omitted), without any indication of the crimes for which they were seizing evidence or any indication that the business was so pervaded with crime that

suppress the evidence seized pursuant to the September 2017 Warrant.

**C. November 2016 Warrant**

Purcell argues that the November 2016 Warrant also failed to identify the relevant offenses with particularity, despite its specification of state-law prostitution-related offenses, because it asserted that there was probable cause to believe that offenses "including, but not limited to" the enumerated crimes had been committed. App'x 82. In his view, the open-ended nature of that introductory language undermined the specificity of the warrant's citation to certain provisions of the New York criminal code. He argues that the November 2016 Warrant's specification of the offense is similar to the language at issue in *Galpin*, 720 F.3d at 436. In that case, the warrant authorized the seizure of

---

there was probable cause to believe that literally any physical or computerized records found in the building to be searched would contain evidence of crime. There, moreover, unlike here, the members of the team who would conduct such an extensive search, which netted several computers and more than 200 boxes of documents, were not familiar with the underlying affidavit. *In re 650 Fifth Ave.*, 934 F.3d at 161, 163. In that case, it is unclear how the agents executing the search could have failed to notice that they were directed to search for anything they thought it appropriate to seize, and "the lion's share of the blame l[ay] with the Government for neglecting to catch these errors or executing the warrant in spite of them." *Id*. at 164. Thus, "[a]pplying the exclusionary rule" in that case "advance[d] its deterrent rationale," *id*. at 164, whereas in this case the warrant's unusual form and function suggest that any deterrent effect would be minimal.

evidence relating to a specific state-law provision, "NYS Penal Law and or Federal Statutes." *Id*. at 441 (internal quotation marks omitted). Officers relied on the open-ended language in the warrant to seize evidence unrelated to the specified offense. *Id*. at 448. This Court "agree[d] that the warrant was facially overbroad and thus violated the Fourth Amendment." *Id*.

We find it unnecessary, however, to decide whether the November 2016 Warrant complied with the Fourth Amendment's particularity requirement. Even assuming, without deciding, that it *was* insufficiently particular with respect to the specification of the suspected offense, its constitutional defect was even less obvious and no less inadvertent than the defect in the September 2017 Warrant. The November 2016 Warrant, like the September 2017 Warrant, "authorize[d] Facebook, Inc. . . . to conduct the search . . . and to provide the results" to law enforcement and was "executed" through service on Facebook, Inc. App'x 83. Thus, it also functioned in a subpoena-like manner, such that Facebook, Inc. was able to comply with its terms without taking the specific suspected offense into consideration and law enforcement officers were able to review the seized information for evidence of trafficking-related conduct without specifically relying on the warrant's terms. Officers' reliance on the November 2016 Warrant

51

was therefore objectively reasonable, and exclusion "would serve little deterrent purpose." *Rosa*, 626 F.3d at 65. We therefore affirm the district court's decision to deny Purcell's motion to suppress the evidence seized pursuant to the November 2016 Warrant.

## II. Challenges to the Sufficiency of the Evidence

Purcell contends that there was insufficient evidence to support conviction on three separate counts. He argues that the government failed to establish venue with respect to any of the three victims on Count One (Alwell, Vasquez, and Alcantara), and that it also failed to establish the element of persuasion or enticement with respect to one victim, Vasquez. He argues further that the government failed to establish that he transported the relevant victim, Vasquez, in interstate commerce, as necessary to support conviction on Count Two. Finally, he argues that the government failed to establish that he coerced the relevant victim, Wood, as necessary to support conviction on Count Five.

We review *de novo* challenges to the sufficiency of the evidence underlying criminal convictions. *United States v. Lebedev*, 932 F.3d 40, 48 (2d Cir. 2019). In doing so, we take "the evidence in the light most favorable to the government,

52

crediting every inference that could have been drawn in the government's favor, and deferring to the jury's assessment of witness credibility and its assessment of the weight of the evidence." *Id*. (internal quotation marks omitted). Under this "exceedingly deferential standard of review[,]" *United States v. Hassan*, 578 F.3d 108, 126 (2d Cir. 2008), "[w]e will sustain the jury's verdict[] so long as *any* trier of fact could have found the essential elements of the crime beyond a reasonable doubt." *United States v. Sabhnani*, 599 F.3d 215, 241 (2d Cir. 2010) (internal quotation marks omitted).

For the reasons set forth below, we agree with Purcell that his conviction on Count One was not supported by sufficient evidence of venue, and we therefore reverse his conviction on that count. However, we reject Purcell's arguments respecting Counts Two and Five and affirm his convictions on those counts.[11]

**A. Count One**

Under Count One, Purcell was convicted of enticing Alwell, Vasquez, and

---

[11] In affirming Count Five of the conviction, we reject both Purcell's sufficiency-of-the-evidence challenge, as discussed in this section of the opinion, and his claim that the admission of Officer Royer's testimony was plain error, as discussed in the subsequent section.

Alcantara to engage in unlawful sexual activity, in violation of 18 U.S.C. §§ 2422(a) and 2. Section 2422(a) provides that "[w]hoever knowingly persuades, induces, entices, or coerces any individual to travel in interstate or foreign commerce, or in any Territory or Possession of the United States, to engage in prostitution, or in any sexual activity for which any person can be charged with a criminal offense, or attempts to do so, shall be fined under this title or imprisoned not more than 20 years, or both." 18 U.S.C. § 2422(a). Because the jury, in completing the special verdict form, determined that Purcell was guilty on the single count of enticement to engage in unlawful sexual activity with respect to each of three different victims, the conviction must be affirmed if the evidence is sufficient with respect to even one of the victims.

Purcell's principal challenge to his conviction on Count One is that the government failed to establish that venue was proper in the Southern District of New York as to any of the victims. "Both the Sixth Amendment and Federal Rule of Criminal Procedure 18 require that defendants be tried in the district where their crime was 'committed.'" *United States v. Ramirez*, 420 F.3d 134, 138 (2d Cir. 2005). When "a defendant is charged with multiple crimes in a single indictment, the government must satisfy venue with respect to each charge." *United States v.*

54

*Davis*, 689 F.3d 179, 185 (2d Cir. 2012). The government bears the burden of proving venue, but need only establish it by a preponderance of the evidence. *United States v. Tzolov*, 642 F.3d 314, 318 (2d Cir. 2011).

"Venue is proper only where the acts constituting the offense – the crime's 'essential conduct elements' – took place." *Ramirez*, 420 F.3d at 138. It is "not proper in a district in which the only acts performed by the defendant were preparatory to the offense and not part of the offense." *United States v. Beech-Nut Nutrition Corp.*, 871 F.2d 1181, 1190 (2d Cir. 1989). This Court has set forth a two-step inquiry for analyzing venue. First, we seek to "identify the conduct constituting the offense" based on the language of the statute. *Davis*, 689 F.3d at 185. Second, we "discern the location of the commission of the criminal acts." *Id*. Venue may lie in multiple districts "if the acts constituting the crime and the nature of the crime charged implicate more than one location." *United States v. Lange*, 834 F.3d 58, 68 (2d Cir. 2016) (internal quotation marks omitted).

In *United States v. Thompson*, we found that a defendant charged with enticing a minor to engage in sexually explicit conduct for the purpose of a video recording, in violation of 18 U.S.C. § 2251, was subject to venue both in the district in which he created the video recording and in the district in which he

55

enticed the minor. 896 F.3d 155, 173 (2d Cir. 2018). Under 18 U.S.C. § 2422(a), under which Purcell was convicted on Count One, the defendant must commit the conduct of enticing or persuading (or attempting to entice or persuade) a victim to travel between states in order to engage in prostitution. Thus, both the defendant's act of enticement and the victim's interstate travel to perform commercial sex work in response to such enticement constitute conduct that is essential to the offense. As was true in *Thompson*, venue may therefore lie both where the defendant enticed or attempted to entice the victim and where the objective of the enticement – in this case, the victim's interstate travel for purposes of engaging in prostitution – transpired. *See id.*

The government argues that "acts constituting the offense" of enticement to engage in prostitution "took place" in the Southern District of New York with respect to all three victims as to whom the jury found Purcell guilty on Count One: Alwell, Vasquez, and Alcantara – or, at minimum, with respect to at least one of the three. *See Ramirez*, 420 F.3d at 138. Purcell contends that no reasonable jury could conclude, even by a mere preponderance of the evidence, that venue for Count One was proper in the Southern District of New York with respect to any of these three victims. We agree with Purcell, for the reasons stated below,

56

and reverse the conviction on Count One due to insufficient evidence of venue.

1. *Sharon Alwell*

Purcell attempted to entice Alwell to engage in prostitution through frequent phone conversations over the course of several weeks in 2016. Throughout this time, Alwell resided in Rockaway, Queens and worked in Coney Island, Brooklyn, both of which are located within the Eastern District of New York. According to Alwell's testimony, Purcell often called her from the road while traveling around the country by car.

Although Purcell proposed to Alwell that she travel interstate to various locations to engage in sex work on his behalf, she never did. The closest she came to working for Purcell occurred during the weekend she spent with him in June 2016, during which she traveled directly from her home in Queens to a house on Long Island, remained on Long Island throughout the weekend, and then returned directly home to Queens.[12] It was neither necessary nor likely that

---

[12] Alwell testified that Purcell drove her approximately twenty minutes from the house in Hempstead, where she spent the weekend, to the address provided by a potential customer. Virtually all locations off of Long Island are more than a twenty-minute drive from Hempstead, and the government presents no evidence to suggest that Purcell and Alwell left Long Island when they drove to this unspecified location.

Alwell traveled either interstate or through the Southern District of New York

that weekend, and the record contains no evidence that she did. Accordingly, the

government does not argue that venue can be based on any location in which

Alwell either traveled interstate or engaged in commercial sex. If venue exists,

therefore, it must be based on the location of Purcell's acts of persuasion.

The government argues that because Purcell called Alwell nearly every

day in an effort to persuade her to engage in prostitution, and because he

necessarily passed through the Southern District of New York each time he

traveled to or from his home in Hempstead to engage in his interstate

prostitution business,[13] a preponderance of the evidence supports the inference

---

[13] The jurisdiction of the Eastern District of New York encompasses Long Island and Staten Island. Long Island comprises four counties: Nassau, Suffolk, Kings, and Queens. Hempstead is located within Nassau County, within the jurisdiction of the Eastern District of New York. However, the government presented unrefuted evidence at trial that any trip on or off of Long Island by car necessarily requires passage through the Southern District of New York. Most routes require passage through Manhattan or the Bronx, which are both within the jurisdiction of the Southern District of New York. And even the route over the Verrazzano-Narrows Bridge, which connects Long Island and Staten Island, entails passage through the Southern District of New York, because the waterway beneath that bridge is within the joint jurisdiction of the Eastern and Southern Districts. *See United States v. Kirk Tang Yuk*, 885 F.3d 57, 72 (2d Cir. 2018) (finding that the defendant committed an "overt act" within the Southern District of New York because he drove over the Verrazzano-Narrows Bridge, "passing over the channel known as 'the Narrows' and through" that District's

that he called Alwell on at least one occasion while driving through the Southern

District of New York. But that argument is based on speculation rather than

evidence. The government points to no cell-phone record or other evidence

pinpointing Purcell's location during any of the calls he made to Alwell. In the

context of Purcell's lengthy road trips, the time spent traversing the Southern

District between Long Island and points south and west would be relatively

brief. Indeed, even if there were evidence indicating that Purcell drove through

that District on specific days on which he also spoke to Alwell by phone, and the

government points to none, that would not establish by a preponderance of the

evidence that he called Alwell *while* driving through that specific District.

The government argues that venue in the Southern District of New York is

also proper as to Alwell because Purcell necessarily drove through the Southern

District of New York when he returned to Long Island to meet Alwell for the

weekend. While Alwell's testimony suggests that Purcell did return from

traveling shortly before that weekend, it does not establish that Purcell returned

to Long Island, where he resided, for the specific purpose of facilitating Alwell's

engagement in prostitution. Thus, Purcell's return to Long Island was at most

_____

jurisdiction).

59

"preparatory to the offense and not part of the offense," and therefore insufficient for purposes of establishing venue. *Beech-Nut*, 871 F.2d at 1190. Accordingly, a reasonable jury could not have found by a preponderance of the evidence that Purcell committed conduct constituting the offense of enticing Alwell to engage in prostitution within the jurisdiction of the Southern District of New York.

2. *Samantha Vasquez*

The government presented evidence, in the form of hotel receipts, Facebook messages, and Backpage advertisements, that Vasquez worked for Purcell as a prostitute in several specific locations around the country, none of which is within the Southern District of New York. Moreover, because the government did not present any evidence at trial regarding the circumstances under which Vasquez began working for Purcell, nothing in the record suggests that either Purcell or Vasquez was located within the Southern District of New York during Purcell's efforts (if any) to recruit Vasquez.

The government argues that venue is nonetheless proper because evidence suggests that Vasquez worked for Purcell as a prostitute at a hotel in Brooklyn, within the Eastern District of New York, and in various locations outside of New York. It argues that a jury could therefore reasonably infer that she traveled

60

through the Southern District of New York – as is necessary to travel between Brooklyn and out-of-state destinations by car – in connection with the performance of prostitution. The record, however, merely places Vasquez in Brooklyn on November 9-10, 2016, and in Raleigh, North Carolina on December 12-14, 2016 (as well as other locations on subsequent dates, including Virginia Beach, Virginia on December 14-16, 2016, and San Jose, California, on December 16-18, 2016, immediately following the booking in Raleigh). There is no record evidence indicating how Vasquez traveled to Raleigh, how or where she spent the month prior to that engagement, or where she resided.

While it is possible that Vasquez traveled from the Eastern District of New York to or through the Southern District of New York at least once between November 10 and December 12, to conclude that she actually did so would be mere guesswork. If Vasquez resided within the Eastern District of New York, she may have remained within that District following her work in Brooklyn until she eventually traveled to Raleigh by plane from one of the two major New York airports within that District. Alternatively, she may have completed her engagement in Brooklyn, traveled by air to a location outside the New York metropolitan area at some point in late November or early December for reasons

unrelated to prostitution, and then traveled to Raleigh from wherever she had spent the intervening month.[14] Under either of these scenarios, Vasquez's travel would not have entailed passage through the Southern District of New York. Moreover, even if Vasquez did traverse the Southern District during the period in which she worked for Purcell, there is no evidence that such travel was related to her performance of commercial sex work. The mere fact that Vasquez worked for Purcell on at least one occasion in a district adjacent to the Southern District, by itself, gives no indication of the timing, routes, modes, or purposes of her travel to and from that engagement. Thus, nothing in the record suggests that Vasquez actually or necessarily set foot in the Southern District in connection with her work for Purcell.

Because the government's theory of venue is entirely speculative, we conclude that no reasonable jury could have found by a preponderance of the evidence that either Purcell or Vasquez committed conduct essential to the crime

---

[14] Vasquez's presumed itinerary, based on record evidence, places her in Virginia Beach, Virginia and San Jose, California on successive days. That itinerary strongly suggests that Vasquez traveled from Virginia to California by plane, because the distance between those locations cannot be traversed by car in one day. Given that it appears that Vasquez traveled by plane on at least one occasion in connection with her work for Purcell, it is not far-fetched to think that she may have done so on additional occasions.

of enticing Vasquez to engage in commercial sex work within the Southern District of New York.[15]

3. *Stephanie Alcantara*

Purcell met with Alcantara, a police detective working undercover, in Charlotte, North Carolina, in an effort to recruit her to work for him as a prostitute. During that meeting, Purcell inquired about Alcantara's ability to travel in connection with the work and stated that he was "on the East Coast." Supp. App'x 49. Purcell did not specifically suggest that Alcantara engage in sex work in New York, let alone locations within the Southern District of New York, but Alcantara testified at trial that she understood Purcell's statement to mean that he expected her to work as a prostitute across the United States, including in New York City.

The government argues that this conversation establishes venue, because it permits the inference that Purcell was attempting to persuade Alcantara to

---

[15] Because we conclude that the government failed to adequately establish venue with respect to the charge that Purcell enticed or persuaded Vasquez to engage in prostitution, Purcell's conviction on Count One cannot be based on his conduct relating to Vasquez. Accordingly, we need not address Purcell's alternative argument that the government failed to present sufficient evidence that he enticed or persuaded Vasquez.

engage in prostitution within the Southern District of New York. We disagree: Purcell's mere reference to his own presence on the "East Coast," in the context of a conversation about Alcantara's potential travel, was not sufficient to establish venue in a specific judicial district within that region, notwithstanding Alcantara's speculation that Purcell had New York City – which in any event spans portions of both the Eastern and Southern Districts – specifically in mind.

Nor, contrary to the government's argument, did Purcell commit conduct essential to the crime of enticement within the Southern District of New York when he presumably drove through that District on his way to meet Alcantara in Charlotte. Purcell attempted to recruit Alcantara by *meeting* with her, not by *traveling to* his meeting with her. This Court has previously held that venue did not lie in a case in which the defendant merely boarded an airplane flight in the relevant jurisdiction, en route to a meeting at which he committed the offense. *See Tzolov*, 642 F.3d at 319. Here, similarly, any passage by Purcell through the Southern District of New York on his way to Charlotte was merely a "preparatory act[]" for the offense conduct and does not by itself establish a basis for venue. *See id.*

\* \* \* \* \*

64

Accordingly, we conclude that no reasonable jury could find, based on a preponderance of the evidence presented at trial, that Purcell committed within the Southern District of New York any conduct essential to the offense of enticing any of the victims named in Count One to engage in prostitution, nor that any of the victims engaged in sex work or interstate travel for purposes of prostitution in that district (or even were recruited to do so in that district) as a result of Purcell's enticements. Accordingly, we reverse Purcell's conviction on Count One and remand to the district court for its dismissal.

**B. Count Two**

Purcell also challenges his conviction on Count Two, for transporting Vasquez in interstate commerce to engage in prostitution, in violation of 18 U.S.C. §§ 2421(a) and 2. He argues that the government failed to present sufficient evidence that he was responsible for Vasquez's transportation.[16]

18 U.S.C. § 2421(a) provides that "[w]hoever knowingly transports any individual in interstate or foreign commerce, or in any Territory or Possession of

_____

[16] Purcell argued to the district court that there was insufficient evidence of venue on Count Two, as well as on Count One. On appeal, however, he does not challenge venue with respect to Count Two. We therefore treat any such argument as abandoned.

the United States, with intent that such individual engage in prostitution, or in any sexual activity for which any person can be charged with a criminal offense, or attempts to do so, shall be fined under this title or imprisoned not more than 10 years, or both." "A defendant will be deemed to have 'transport[ed]' an individual under Section 2421 where the evidence shows that the defendant personally or through an agent performed the proscribed act of transporting, as opposed to situations where the victim travels under her own steam, without need of anyone to 'transport' her." *United States v. Holland*, 381 F.3d 80, 86 (2d Cir. 2004) (internal quotation marks and citations omitted). Evidence that a defendant "invit[ed] travel, purchas[ed] tickets, and accompan[ied] individuals on trips is more than sufficient to establish" that the defendant "transport[ed]" those individuals. *Id*. at 87.

In *United States v. Mi Sun Cho*, we concluded that the defendant transported the victim in interstate commerce, in violation of § 2421(a), despite the fact that she "did not pay for [the victim's] ticket or book her passage." 713 F.3d 716, 720 (2d Cir. 2013). We determined that "[b]y agreeing . . . to provide a prostitution job for [the victim], and by coordinating and prearranging the date and time on which she would travel," the defendant effectively caused the

66

victim's interstate travel for purposes of engaging in prostitution. *Id*. at 720-21.

We found further support in the fact that the defendant provided a driver for the

final intrastate portion of the victim's interstate travel, which in our view

constituted "direct[] organiz[ation]" of her "transportation in interstate

commerce." *Id*. at 721.

Purcell correctly points out that the record is silent as to the manner in

which Vasquez traveled between different cities and states while working for

Purcell. The government presented no evidence that directly indicates what

mode of transportation Vasquez used, who arranged her transportation, who

paid for her transportation, or whether she and Purcell traveled together. But the

documentary evidence, including Facebook messages between Purcell and

Palmer in which they discuss and coordinate hotel accommodations for Vasquez,

supports the conclusion that Purcell determined where and when Vasquez

engaged in prostitution: Brooklyn on November 9-10, 2016; Raleigh on December

12-14, 2016; Virginia Beach on December 14-16, 2016; San Jose on December 16-18,

2016, Phoenix on January 18-19, 2017; and Irvine on February 17-20, 2017.

Because some of these accommodations were scheduled for successive days, they

strongly suggest that Purcell required Vasquez to travel to and from specific

locations on specific dates. The evidence that Purcell also arranged hotel rooms for himself in Virginia Beach and San Jose, on the same dates as the reservations for Vasquez, suggests that he accompanied her during her successive stays in those locations. A jury could reasonably infer from this evidence that, for example, Purcell and Vasquez both stayed in Virginia Beach on December 14-15, 2016, in hotel rooms arranged by Purcell, so that Vasquez could work as a prostitute there; that they both flew from Virginia to California on December 16, 2016; and that they both stayed in San Jose on December 16-18, 2016, in hotel rooms arranged by Purcell, so that Vasquez could work as a prostitute there.

Under these circumstances, arranging Vasquez's accommodations was tantamount to arranging her travel. As in *Mi Sun Cho*, Purcell "agree[d] . . . to provide a prostitution job" to Vasquez and "coordinat[ed] and prearrang[ed] the date[s]" of her travel. *Mi Sun Cho*, 713 F.3d at 720. Even if we assume (for the sake of argument, though the assumption seems far-fetched under the circumstances) that Vasquez booked and paid for her own flight from Virginia to California, and flew separately from Purcell, her travel was clearly subject to the parameters established by the hotel arrangements, which the evidence suggests Purcell paid for. By providing Vasquez with accommodations in certain locations on certain

68

days for the purposes of engaging in commercial sex work, Purcell facilitated her

travel to those locations.[17] We therefore conclude that sufficient evidence

supported the jury's conclusion that Purcell "transport[ed]" Vasquez within the

meaning of 18 U.S.C. § 2421(a), and reject Purcell's challenge to his conviction on

Count Two.

**C. Count Five**

Purcell challenges his conviction on Count Five, for sex trafficking by force,

fraud, and coercion in violation of 18 U.S.C. §§ 1591(a)(1), (a)(2), and 2. He argues

that the government failed to present sufficient evidence that he coerced Wood,

---

[17] Purcell relies on the D.C. Circuit's decision in *United States v. Jones*, 909 F.2d 533 (D.C. Cir. 1990) to suggest that evidence of hotel reservations and Backpage advertisements alone is insufficient to find that he violated Section 2421. In *Jones*, the defendant worked as a telephone dispatcher for an escort service. Though the defendant took telephone orders for escorts and then contacted escorts to notify them of the names and addresses of their customers, the escorts made their own travel arrangements and transported themselves. *Id*. at 536, 540. The D.C. Circuit held that the defendant's conduct was insufficient to support a conviction under Section 2421 because he merely provided an inducement to travel. *Id*. at 540. Contrary to the D.C. Circuit's decision in *Jones*, our decision in *Mi Sun Cho* suggests that inducing an individual to travel for purposes of engaging in prostitution, at least where such inducement takes the form of "agreeing . . . to provide a prostitution job . . . and [] coordinating and prearranging the date and time" of her travel, is effectively "transporting" the individual under Section 2421. 713 F.3d at 720-21. In light of this controlling precedent, we reject Purcell's argument that the evidence that he arranged for Vasquez's accommodations and prostitution jobs is insufficient under *Jones*.

the victim he was convicted of trafficking on this count. 18 U.S.C. § 1591(a) establishes criminal penalties for "[w]hoever knowingly" "in or affecting interstate or foreign commerce, . . . recruits, entices, harbors, transports, provides, obtains, advertises, maintains, patronizes, or solicits by any means a person" or "benefits, financially or by receiving anything of value, from participation in a venture which has engaged in" such an act, while "knowing, or, . . . in reckless disregard of the fact, that means of force, threats of force, fraud, coercion, . . . or any combination of such means will be used to cause the person to engage in a commercial sex act." 18 U.S.C. § 1591(a), (1) (2).[18] When forcible sex trafficking, as described in the statute, is "effected by means of force, threats of force, fraud, or coercion," the offense is punishable by a mandatory minimum sentence of fifteen years' imprisonment. *Id*. § 1591(b)(1). Purcell contends that the government failed to present sufficient evidence that he caused Wood to engage in commercial sex by means of "force, threats of force, fraud, coercion," or "any combination" thereof. *See id*. § 1591(a). The government does not argue that Purcell used force,

---

[18] 18 U.S.C. § 1591 also prohibits the trafficking of a person "knowing, or, . . . in reckless disregard of the fact, . . . that the person has not attained the age of 18 years and will be caused to engage in a commercial sex act." *Id*. § 1591(a). Because Wood was over that age at the time Purcell allegedly trafficked her, that branch of the statute is not implicated here.

threats of force, or fraud, but it maintains that the evidence sufficiently supported a finding of coercion.

18 U.S.C. § 1591 defines "coercion" to mean "threats of serious harm to or physical restraint against any person," "any scheme, plan, or pattern intended to cause a person to believe that failure to perform an act would result in serious harm to or physical restraint against any person," or "the abuse or threatened abuse of law or the legal process." *Id*. § 1591(e)(2). It defines "serious harm" as "any harm, whether physical or nonphysical, including psychological, financial, or reputational harm, that is sufficiently serious, under all the surrounding circumstances, to compel a reasonable person of the same background and in the same circumstances to perform or to continue performing commercial sexual activity in order to avoid incurring that harm." *Id*. § 1591(e)(5).

This Court has previously explained that the government's standard of proof with respect to the element of coercion is a "hybrid" of subjective and objective aspects, which "permits the jury to consider the particular vulnerabilities of a person in the victim's position but also requires that her acquiescence be objectively reasonable under the circumstances." *United States v. Rivera*, 799 F.3d 180, 186-87 (2d Cir. 2015). A defendant's behavior may be

coercive when it is "sufficiently serious to cause both the victim[] and reasonable people of the same background and in the same circumstances to feel coerced." *Id*. at 187. "What the statute means to describe, and does describe awkwardly, is a state of mind in which the [defendant] is familiar with a pattern of conduct. . . . What the statute requires is that the defendant know in the sense of being aware of an established modus operandi that will in the future cause a person to engage in prostitution." *United States v. Todd*, 627 F.3d 329, 334 (9th Cir. 2010).

The evidence presented at trial gave no indication that Purcell used force against Wood, used force or discussed the use of force against other individuals in her presence, or expressly threatened her with force or harm while she was in his company. (The threatening text message that he sent to Wood after she fled from the hotel was not a means of causing her to engage in prostitution, and therefore does not constitute direct evidence of coercion.) Wood acknowledged, on cross-examination, that Purcell "didn't do [any]thing to [her]" and behaved in a "cordial" manner. App'x 395.

Nonetheless, Wood testified repeatedly that Purcell's behavior inspired fear in her, and that she remained in his company, followed his instructions, and engaged in commercial sex with a customer based on that fear. She specifically

72

characterized her fears as concerns that Purcell would have reacted "harmful[ly]" if she had tried to leave or otherwise refused to comply with his expectations. *Id.* at 263, 276, 299, 302, 324. Wood also testified that she did not want to engage in commercial sex activity in connection with Purcell's business, because she "didn't want to do anything f[o]r" him and, contrary to her prior experiences with prostitution, she felt that having commercial sex for Purcell's business "was not something [she] had decided on [her] own" to do. *Id.* at 312. Wood's dramatic exit from the State College hotel – running barefoot into the Pennsylvania winter on the first occasion on which Purcell had let her out of his sight, begging a stranger for help and getting into his car, and self-identifying as a prostitute "running for [her] life" at the police station, *id.* at 327 – corroborates her claim that she acted out of genuine fear. A reasonable jury could have concluded that Wood engaged in commercial sex activity because of a subjective fear that Purcell would cause her "serious harm" if she refused to do so. *See* 18 U.S.C. § 1591(e)(2).

Moreover, Purcell's conduct, viewed cumulatively, suggests a pattern of behavior designed to intimidate and exert control over Wood. Purcell insisted that Wood sever her ties with her prior or outside life: he called her former pimp to announce that Wood now worked for him, instructed Wood to change her

73

phone number, and took possession of her cell phone except when she was answering calls from potential customers. Purcell led Wood to feel that she was subject to his constant oversight and surveillance by instructing her to leave the door ajar when she used the bathroom, sleeping beside her bed, and suggesting that she could not attend a court appearance or funeral without him. And he signaled that she was subject to his control, with little or no autonomy, by taking possession of all of her cash and earnings, and by leading her to understand that she was expected to abide by restrictive "rules," including a prohibition on speaking to or making eye contact with other men and the expectation that she would obtain a "Casino" neck tattoo. *See United States v. Lacy*, 904 F.3d 889, 896 (10th Cir. 2018) (finding the element of coercion established where the victim "did not want to have sex with the client, but [] felt coerced into doing so because of the vulnerable position she was in as a homeless women whose car and belongings were now in the possession and control of a man"). The logical objective of Purcell's intimidating pattern of behavior was to cause Wood to believe that she could not refuse to work as a prostitute for him without incurring harm, and therefore that she had no viable alternative to engaging in commercial sex activity with Purcell's customers.

Though the threat of harm if Wood failed to conform to Purcell's expectations was never made explicit, his actions were imbued with a palpable threatening subtext. When a defendant demands that a putative trafficking victim abide by an especially restrictive and menacing code of conduct, a reasonable jury may fairly conclude that it was objectively reasonable for the putative victim to acquiesce out of fear, even when the consequence of non-compliance remains unspoken and unspecified. Moreover, Purcell's pattern of behavior suggests that he acted with an intention to intimidate, and therefore with a knowledge that his conduct was likely to cause Wood to engage in commercial sex out of fear. Evidence suggests that both Wood and Purcell had sufficient experience in the commercial sex industry to understand an "established modus operandi that will in the future cause a person to engage in prostitution." *Todd*, 627 F.3d at 334.

Accordingly, we conclude that a reasonable jury could have found, beyond a reasonable doubt, the element of coercion based on the evidence presented at trial. We therefore reject Purcell's claim that his conviction on Count Five was not supported by sufficient evidence.

**III. Challenge to the Admission of Officer Royer's Testimony**

Purcell argues that we should vacate his conviction on Count Five and remand to the district court for a new trial on that count, in light of the district court's admission of trial testimony by Officer Heather Royer regarding Marie Ann Wood's interview with the State College Police Department. Purcell argues that the government's introduction of Royer's testimony violated its pretrial agreement not to elicit testimony regarding statements made by Wood in her police interview. He argues further that Royer's testimony constituted inadmissible hearsay, and that the admission of that testimony violated his rights under the Confrontation Clause of the Sixth Amendment.

At trial, Purcell's counsel did not object to the admission of Royer's testimony. "Our authority to reverse errors not objected to at trial is 'circumscribed.'" *United States v. Filani*, 74 F.3d 378, 387 (2d Cir. 1996) (quoting *United States v. Olano*, 507 U.S. 725, 732 (1993)). In such cases, the "only argument available" to an appellant is that the district court's alleged error "constituted plain error as defined by Rule 52(b) of the Federal Rules of Criminal Procedure." *Id*. Rule 52(b) provides that "[a] plain error that affects substantial rights may be considered even though it was not brought to the court's attention." FED. R. CRIM. P. 52(b). "We may correct an error that is clear and obvious, affected the

defendant['s] substantial rights, and seriously affected the fairness, integrity, or public reputation of the judicial proceedings." *United States v. Mehta*, 919 F.3d 175, 180 (2d Cir. 2019).

## A. Alleged Breach of Pretrial Promise

At a pretrial conference on October 11, 2018, the government told the district court that the parties had agreed that Wood's initial statements upon arriving at the State College Police Department would be admitted under the "excited utterance" exception to the rules precluding the admission of hearsay, *see* FED. R. EVID. 803(2), but that the government would not introduce Wood's statements from her police interview. At trial, the government called Royer, one of two State College Police Department officers who conducted Wood's interview, as a witness. On direct examination of Royer, the government elicited testimony regarding Wood's statements to police during that interview. Purcell argues that the government's introduction of that testimony violated its pretrial promise, and that the district court's failure to preclude that testimony – notwithstanding defense counsel's failure to object to it – constitutes plain error. We disagree.

We agree with the proposition, articulated by other circuit courts and not

contested by the government in this case, that pretrial agreements between the government and a defendant to forgo "the presentation of otherwise admissible evidence are enforceable." *United States v. McKinney*, 758 F.2d 1036, 1046 (5th Cir. 1985). "[W]hen the government and a defendant enter into a pretrial agreement both parties are entitled to rely upon that agreement in preparing their respective cases." *United States v. Jackson*, 621 F.2d 216, 220 (5th Cir. 1980). "Once prosecutors undertake such commitments, they are bound to honor them." *United States v. Liburd*, 607 F.3d 339, 343 (3d Cir. 2010); *see also United States v. Mikolon*, 719 F.3d 1184, 1189 (10th Cir. 2013).

Here, however, it is not clear from the record whether the parties understood their pretrial agreement to be contingent on the assumption that defense counsel would not itself elicit testimony regarding Wood's statements in her police interview, something that defense counsel did repeatedly in cross-examining Wood, prior to the government's direct examination of Royer. On the one hand, the government's description of the parties' agreement to the district court, at the October 11, 2018 pretrial conference, did not identify any condition to its promise not to elicit such testimony. On the other hand, the government's commitment not to elicit certain testimony is arguably best understood not as an

unqualified promise, but rather a commitment not to *initiate* questioning about Wood's statements to the State College police. It would hardly be logical for a prosecutor to agree not to introduce corrective evidence about an interview even after the defense elicited a partial and arguably misleading account of the substance of that interview. Defense counsel's failure to object to Royer's testimony supports the latter reading, because it suggests that defense counsel did not view the testimony as a breach of the parties' agreement at the time.

It is not clear to us that the district court erred at all in allowing the government's elicitation of Royer's testimony, given the ambiguous scope of the parties' pretrial agreement and the absence of any objection by defense counsel. But even if a fuller exploration of the issue might have led to the conclusion that the government's promise was unqualified, at a minimum we cannot conclude that, in the absence of any effort by the defense, by objecting, to establish a record on that issue, the alleged error was a "clear and obvious" one that "seriously affected the fairness [or] integrity" of the trial, as it must be for an appellant to prevail on plain error review. *Mehta*, 919 F.3d at 180. Indeed, once the defense opened the subject of whether Wood's statements to the police were consistent with her trial testimony, it promoted rather than undermined the "fairness and

79

integrity" of the trial to put the full substance of the interview before the jury to permit them to assess that challenge to her credibility. We therefore reject Purcell's argument that the district court's admission of Royer's testimony constituted plain error because it allowed the government to renege on a pretrial commitment.

### B. Alleged Inadmissible Hearsay

Purcell also argues that the district court's admission of Royer's testimony constitutes plain error because it included hearsay, which was inadmissible under the Federal Rules of Evidence. As we explain below, we disagree and find that the testimony was admissible non-hearsay under Federal Rule of Evidence 801(d)(1)(B)(ii).

The Federal Rules of Evidence, after defining hearsay generally as an out-of-court "statement . . . offer[ed] in evidence to prove the truth of the matter asserted," FED. R. EVID. 801(c), provide that "[h]earsay is not admissible," barring exceptions provided for by those rules, other federal rules, or a federal statute. *See* FED. R. EVID. 802. In addition to establishing various exceptions, however, the Rules also set forth certain exclusions from the broad definition of hearsay. Thus, a statement that "meets [certain specified] conditions is not hearsay," even if it

otherwise falls within the general definition of hearsay. *See* FED. R. EVID. 801(d).

One such exclusion, set forth in Rule 801(d)(1)(B), provides:

> (1) A Declarant-Witness's Prior Statement. The declarant testifies and is subject to cross-examination about a prior statement, and the statement: . . .
> (B) is consistent with the declarant's testimony and is offered:
> (i) to rebut an express or implied charge that the declarant recently fabricated it or acted from a recent improper influence or motive in so testifying; or
> (ii) to rehabilitate the declarant's credibility as a witness when attacked on another ground.

FED. R. EVID. 801(d)(1)(B).

Rule 801(d)(1)(B) was amended in 2014 to include subsection (ii), which expands the purposes for which prior consistent statements may be offered. Prior to the amendment, Rule 801(d)(1)(B) permitted the substantive use of prior consistent statements that were probative to rehabilitate the declarant's credibility only by rebutting charges of recent fabrication, improper influence, or improper motive. *See* FED. R. EVID. 801(d)(1)(B) (Apr. 26, 2011, eff. Dec. 1, 2011). The Advisory Committee Note to the 2014 amendment explains that "the original Rule 801(d)(1)(B)" was "limited" in "scope" because it "left many prior consistent statements potentially admissible only for the limited purpose of rehabilitating a witness's credibility," and "did not . . . provide for substantive admissibility of

consistent statements that are probative," for example, "to explain what otherwise appears to be an inconsistency in the witness's testimony" or "to rebut a charge of faulty memory." FED. R. EVID. 801 advisory committee's note to 2014 amendment. As amended in 2014, Rule 801(d)(1)(B)(ii) allows for the substantive use of prior consistent statements that are probative for rehabilitative purposes other than those specifically enumerated in subsection (i).

This Court has previously relied on subsection (ii) of the amended Rule 801(d)(1)(B) in finding that the district court did not abuse its discretion in admitting prior consistent statements that were introduced to rebut "defendants' attacks on [the declarant's] credibility and memory," notwithstanding that the defendants' "challenges to [the declarant's] memory were brief and were not their main challenges." *United States v. Flores*, 945 F.3d 687, 705-06 (2d Cir. 2019). Similarly, the Sixth Circuit has found that a district court properly admitted evidence of prior consistent statements that "rebutted [the d]efendant's attack on [the declarant's] purportedly faulty memory." *United States v. Cox*, 871 F.3d 479, 487 (6th Cir. 2017).

In cross-examining Wood, defense counsel repeatedly referenced Wood's statements to the State College police in order to highlight inconsistencies

between those statements and the testimony she had given at trial on direct examination. Defense counsel emphasized omissions in Wood's statements to the State College police in 2012, including discussion of Robert, her former pimp, and the "choosing fee" that she paid to Purcell in cash. It sought to use these inconsistencies to undermine Wood's credibility by suggesting that her 2012 statements were "edited," "not a fair summary of what actually happened," and "withheld some information" that she "didn't want to tell" to the police. App'x 347, 349-50.

Thus, while defense counsel's goal may have been to sow doubts about Wood's candor and veracity generally, it did not directly suggest that the accuracy of Wood's trial testimony was marred by recent fabrication or a recently created improper motive or influence. Insofar as the government argues that Royer's testimony was admissible under Rule 801(d)(1)(B)(i) to rebut such impeachment efforts, we disagree. We cannot say for certain (and need not decide) that Royer's testimony would have been admissible under the prior version of Rule 801(d)(1)(B), which limited the grounds for admission of consistent statements to rehabilitation efforts responsive only to specified types of impeachment charges.

As amended, however, Rule 801(d)(1)(B) also allows for the "substantive admissibility of consistent statements that are probative to explain what otherwise appears to be an inconsistency in the witness's testimony." FED. R. EVID. 801 advisory committee's note to 2014 amendment. In its cross-examination of Wood, defense counsel highlighted the aspects of Wood's 2012 statements to the State College police that seemed most inconsistent with her trial testimony. By introducing Royer's testimony, which recounted Wood's statements to police in full and largely matched the version of events that Wood had recounted at trial, the government plainly sought to rebut the charge of inconsistency and to rehabilitate Wood's credibility by placing the alleged discrepancies in context. Royer's testimony concerning Wood's 2012 statements may be fairly interpreted as statements that were "consistent with [Wood's] testimony and [were] offered" "to rehabilitate [Wood's] credibility as a witness when attacked on a[] ground" other than recent fabrication or recent improper influence or motive. *See* FED. R. EVID. 801(d)(1)(B)(ii).

Because we find that Royer's testimony was admissible non-hearsay under Rule 801(d)(1)(B)(ii) of the Federal Rules of Evidence, the district court did not commit plain error by declining to exclude it on evidentiary grounds.

## C. Alleged Confrontation Clause Violation

Finally, we also reject Purcell's argument that the admission of Royer's testimony violated his constitutional rights under the Confrontation Clause of the Sixth Amendment. In that clause, the Constitution provides that "[i]n all criminal prosecutions, the accused shall enjoy the right . . . to be confronted with the witnesses against him." U.S. CONST. amend. VI. The Supreme Court has "explained that the Confrontation Clause was designed to protect against the 'principal evil' of using *ex parte* statements against the accused." *United States v. James*, 712 F.3d 79, 88 (2d Cir. 2013) (quoting *Crawford v. Washington*, 541 U.S. 36, 50 (2004)). Thus, "an out-of-court statement made by a declarant *who does not testify at trial*, where the statement is deemed 'testimonial,' is not admissible unless the declarant is unavailable and the defendant had a prior opportunity to cross-examine the declarant concerning the statement." *United States v. Burden*, 600 F.3d 204, 223 (2d Cir. 2010) (emphasis added).

Royer's testimony regarding Wood's statements to the State College police did not implicate Purcell's Confrontation Clause rights, irrespective of whether those statements were "testimonial," because Wood testified at trial. Purcell had a full opportunity to confront the declarant, Wood, and to cross-examine her

regarding her out-of-court statements to the State College police; indeed, defense counsel *did* cross-examine her extensively concerning those statements.[19] Purcell's argument that additional testimony regarding those out-of-court statements violated his Confrontation Clause rights is therefore untenable.

## CONCLUSION

For the reasons set forth above, we agree with Purcell's claim that his conviction on Count One, for enticement to engage in unlawful sexual activity in violation of 18 U.S.C. §§ 2422(a) and 2, must be reversed for lack of sufficient evidence of proper venue, but we reject his challenges to the sufficiency of the evidence on Counts Two and Five, the denial of his pretrial motion to suppress, and the admission of Royer's testimony. Accordingly we REVERSE the conviction on Count One, AFFIRM the conviction on all other counts, and REMAND to the district court for the dismissal of Count One and resentencing.

---

[19] It could be argued that Purcell was entitled to an opportunity to recall Wood for *further* cross-examination about those portions of the interview that were newly offered by the government through Royer's testimony. But Purcell did not request such an opportunity, and it is a reasonable inference that it would not have been in Purcell's interest to focus further jury attention on the details of what Wood told the police after escaping from him.