*This opinion is subject to administrative correction before final disposition.*

# United States Navy–Marine Corps
# Court of Criminal Appeals

_____

Before
GASTON, STEWART and HOUTZ
Appellate Military Judges

_____

**UNITED STATES**
*Appellee*

**v.**

**Samuel D. DRINKERT**
Construction Mechanic Second Class (E-5), U.S. Navy
*Appellant*

**No. 201900275**

Argued: 26 January 2021—Decided: 29 March 2021

Appeal from the United States Navy-Marine Corps Trial Judiciary

Military Judge:
Hayes C. Larsen

Sentence adjudged 4 June 2019 by a general court-martial convened at Naval Station Norfolk, Virginia, consisting of officer and enlisted members. Sentence approved by the convening authority: confinement for 15 years and a dishonorable discharge.

For Appellant:
*Mr. Robert A. Feldmeier, Esq.* (argued)
*Lieutenant Commander Kevin R. Larson, JAGC, USN* (on brief)

For Appellee:
*Lieutenant Gregory A. Rustico, JAGC, USN* (argued)
*Major Clayton L. Wiggins, USMC* (on brief)

_____

## PUBLISHED OPINION OF THE COURT

————————————

HOUTZ, Judge:

Appellant was convicted, contrary to his pleas, of three specifications of sexual assault, and one specification of indecent visual recording, in violation of Articles 120 and 120c, Uniform Code of Military Justice [UCMJ], 10 U.S.C. §§ 920, 920c (2012 & Supp. III 2016).

Appellant raises nine assignments of error [AOE], which we renumber as follows: (1) the military judge abused his discretion when he declined to suppress evidence from Appellant's cellular phone; (2) the military judge improperly admitted hearsay evidence; (3) the military judge improperly excluded Appellant's statements as hearsay; (4) Appellant received ineffective assistance from his trial defense counsel; (5) the evidence is not factually sufficient to support Appellant's convictions; (6) the military judge abused his discretion when he declined to release Appellant from pre-trial confinement; (7) the record of trial was not served on Appellant; (8) Appellant's trial defense counsel were generally ineffective during discovery and at trial; and (9) Appellant was denied due process when he was provided an inadequate accounting of the personal property seized from his residence by law enforcement.[1]

After careful consideration of the record of trial and the pleadings of the parties, we find no prejudicial error and affirm.

## I. BACKGROUND

Appellant's convictions arise out of separate incidents involving two victims, his brother's ex-girlfriend, Ms. Fox,[2] and a co-worker, Ms. William.

The incident involving Ms. Fox occurred in August 2017 when Ms. Fox visited Appellant and his brother at their residence in Virginia Beach, Virginia. After an evening spent consuming alcohol and playing games, Appellant's

————————————

[1] We have considered Appellant's sixth, seventh, eighth, and ninth AOEs, raised pursuant to *United States v. Grostefon,* 112 M.J. 431 (C.M.A. 1982), and find them to be without merit. *United States v. Matias*, 25 M.J. 356, 363 (C.M.A. 1987).

[2] All names in this opinion, other than those of the judges and counsel, are pseudonyms.

brother and Ms. Fox became sick and went to the bathroom to vomit. A short time later Appellant went into the bathroom and assisted his brother to a bedroom. Appellant then returned to the bathroom, found Ms. Fox kneeling on the floor, and penetrated Ms. Fox's vulva with his finger and attempted to engage in sexual intercourse with her while she said "no" and resisted. At that point Appellant assisted Ms. Fox to one of the vacant bedrooms and told her he would leave her alone.

After being brought into the bedroom, Appellant's brother testified that "the next thing I remember was [Ms. Fox] screaming 'no,' and shortly after that, [Appellant] came into my room and said he thinks that he tried to rape her."[3] A short time later Ms. Fox became enraged, yelled at Appellant, broke household items, and later grabbed a kitchen knife and cut her own arm. Appellant's brother provided aid to Ms. Fox and Appellant called 911 for emergency assistance. During the 911 call Appellant made incriminating statements, including the statement, "I believe I tried to rape her."[4] Appellant made further admissions to the responding police officers and to the detective who interviewed him later that morning, admitting that he penetrated Ms. Fox's vagina with his finger and "probably should've stopped."[5] Ms. Fox was taken to a hospital where she was interviewed and told investigators about the assault.

The incidents involving Ms. William occurred several months later in March and April 2018 at the same residence, where Ms. William, a co-worker and friend of Appellant, spent a significant amount of time due to her unstable housing situation. On 30 March 2018, Appellant, Ms. William, and a mutual friend were at the house consuming alcohol and socializing. Ms. William became sleepy and woke up the next morning in Appellant's bed (when he brought her breakfast).[6] On 3 April 2018, Ms. William and Appellant were again at Appellant's residence drinking and socializing. Ms. William eventually became tired and went to bed. While her memory became hazy, she recalled being in Appellant's bedroom prior to falling asleep and awoke early the next morning with Appellant's penis inside her vagina. She feigned being asleep while Appellant ejaculated inside of her, cleaned her

---

[3] R at 643-44.

[4] *Id.* at 694.

[5] Pros. Ex. 3.

[6] This incident was the basis for one specification of sexual assault against Appellant of which he was found not guilty.

with baby wipes, put her underwear on, and left for work. When Ms. William confronted Appellant about the incident a few days later over a messaging application, and told him she was avoiding him because "[y]ou raped me," Appellant initially replied, "What?" and "You don't remember do you?"[7] She then told him she did remember, including that he had "baby wipe [sic] and put everything back how it was," that he was "wrong," and that she did not want to see him again, to which Appellant responded, "I understand."[8]

On 16 April 2018, after Ms. William had provided a statement to the Naval Criminal Investigative Service [NCIS] alleging that Appellant had sexually assaulted her on 30 March and 4 April, five Virginia Beach Police officers with the assistance of two NCIS agents executed a civilian search warrant at Appellant's residence. The warrant permitted law enforcement to search for and seize evidence to include "cellular phone / electronics which can take photographs an[d] any media storage devices, to include USB, disks, tablets, laptop and desktop computers."[9] The search warrant did not authorize searching Appellant's person.

When the search began, Appellant was not at his residence, as he was in the process of being discharged from the hospital after nine days of involuntary mental health treatment at Naval Medical Center Portsmouth. At the request of NCIS, immediately after being discharged, Appellant was escorted from the Medical Center to the residence by two members of his command. The NCIS agent was "certain" or "pretty sure [Appellant] had his phone on him" when he asked the command to escort him to the residence.[10] Upon his arrival, Appellant found his residence in the process of being searched and was asked by NCIS to enter the residence. The NCIS agent placed his hand on Appellant's back, guided him to the door, and once inside, directed Appellant to empty his pockets "for officer safety."[11] Appellant removed his wallet and cell phone from his pockets and was then guided to the kitchen where he was directed to place his cell phone and wallet on a table and take a seat. At that point, the NCIS agent and a detective from the Virginia Beach Police explained the purpose of the search warrant, and the NCIS agent provided Appellant with a permissive authorization for search and seizure [PASS]

---

[7] Pros. Ex. 5.

[8] *Id.*

[9] App. Ex. LXXVIII at 2.

[10] R. at 17.

[11] *Id.*

form for his cell phone. The NCIS agent read the PASS form to Appellant and told Appellant he had a constitutional right to refuse the search. Appellant then signed the PASS authorizing the search and seizure of his cell phone. After seizing the cell phone and noticing it was locked, the NCIS agent asked Appellant for the passcode which Appellant provided.

A forensic review of the phone revealed photographs taken on 3 April 2018, to include one depicting a finger penetrating Ms. William's vagina. There was another photo of Ms. William while she appeared to be asleep, a photo of Ms. William topless, and search terms related to Ms. William. Pursuant to the search warrant, law enforcement also seized Appellant's laptop computer. The forensic review of the computer revealed the same photographs, as well as search terms related to Ms. William. Evidence existing on the phone, but not the computer, included a specific search for "[Ms. William] naked," as well as searches related to whether one could get pregnant on birth control. All the other evidence from the laptop computer, to include the digital penetration photo, contained metadata which showed the time and location where the photos were taken, as well as the device used to take them.

## II. DISCUSSION

### A. Suppression Ruling

Prior to trial, Appellant moved to suppress any evidence obtained during the search of his cell phone. After an Article 39(a), UCMJ, hearing, the military judge denied the motion in a written ruling. In his findings of fact and conclusions of law, the military judge determined that Appellant voluntarily consented to the search of the phone and that, even assuming he did not, excluding the evidence would not result in appreciable deterrence of future unlawful searches or seizures and the benefits of such deterrence did not outweigh the costs to the justice system.[12]

Appellant asserts that the military judge abused his discretion in denying the motion to suppress. We review a military judge's ruling on a motion to suppress evidence for abuse of discretion and consider the evidence in the light most favorable to the party that prevailed on the motion.[13] A military judge abuses his discretion if the findings of fact upon which he predicates his

---

[12] App. Ex. LXXVIII.

[13] *United States v. Blackburn*, 80 M.J. 205, 210-11 (C.A.A.F. 2020).

ruling are not supported by the evidence in the record, if he uses incorrect legal principles, or if he applies the legal principles to the facts in a way that is clearly unreasonable.[14] To warrant reversal, the decision must be "arbitrary, fanciful, clearly unreasonable or clearly erroneous."[15]

Evidence obtained as a result of an unlawful search or seizure by a governmental agent is generally inadmissible against an accused if:

> (1) the accused makes a timely motion to suppress or an objection to the evidence . . .

> (2) the accused had a reasonable expectation of privacy in the person, place, or property searched; . . . or the accused would otherwise have grounds to object to the search or seizure under the Constitution of the United States as applied to members of the Armed Forces; and

> (3) exclusion of the evidence results in appreciable deterrence of future unlawful searches or seizures and the benefits of such deterrence outweigh the costs to the justice system.[16]

Once the defense makes an appropriate motion or objection, the prosecution bears the burden of proving the evidence was lawfully obtained.[17]

The Fourth Amendment provides, "The right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures, shall not be violated, and no Warrants shall issue, but upon probable cause, supported by Oath or affirmation."[18] A search conducted pursuant to a warrant or search authorization is presumptively reasonable.[19] As an exception to the warrant requirement, "evidence of a search conducted without probable cause is admissible if conducted with lawful consent."[20] In order to be lawful, consent must be given voluntarily. "Voluntariness is a

---

[14] *United States v. Ellis*, 68 M.J. 341, 344 (C.A.A.F. 2010).

[15] *United States v. Sullivan*, 74 M.J. 448 (C.A.A.F. 2015) (citation omitted).

[16] Mil. R. Evid. 311(a).

[17] Mil. R. Evid. 311(d)(5)(A).

[18] U.S. Const. amend. IV.

[19] *See United States v. Wicks*, 73 M.J. 93, 99 (C.A.A.F. 2014) (citing *Katz v. United States*, 389 U.S. 347, 357 (1967)).

[20] Mil. R. Evid. 314(e)(1).

question to be determined from all the circumstances."[21] Courts look to six non-exhaustive factors from *United States v. Wallace*[22] to determine the voluntariness of consent:

> (1) the degree to which the suspect's liberty was restricted; (2) the presence of coercion or intimidation; (3) the suspect's awareness of his right to refuse based on inferences of the suspect's age, intelligence, and other factors; (4) the suspect's mental state at the time; (5) the suspect's consultation, or lack thereof, with counsel; and (6) the coercive effects of any prior violations of the suspect's rights.[23]

*1. Voluntariness of Appellant's Consent*

In his written ruling, the military judge found the first four *Wallace* factors favored the Government and the last two were neutral.[24] Specifically, the military judge found that (1) Appellant's liberty was not restricted in any significant manner; (2) there was no coercion or intimidation during law enforcement's interaction with Appellant; (3) Appellant had actual knowledge of his right to refuse consent; (4) Appellant's mental state favored voluntariness because Appellant had been "deemed fit by medical personnel," as evidenced by his recent release from involuntary mental health care; (5) there was no evidence that Appellant consulted with counsel prior to consent; and (6) there were no prior violations of Appellant's rights prior to the search.[25]

We find that the military judge's application of the *Wallace* factors to the facts was clearly unreasonable. Regarding the first *Wallace* factor, we find that Appellant's liberty *was* restricted in a significant manner at the time he signed the PASS. Upon his release from a nine-day involuntary stay at a mental health facility, he was escorted by command members to the situs of the search, ushered into his residence while the search was still ongoing, told to empty his pockets, and directed to a chair in the kitchen. We agree with Appellant that a servicemember in this scenario is not and would not feel free to leave, since "[i]f Appellant faced no restrictions on his liberty, the escort

---

[21] Mil. R. Evid. 314(e)(4).

[22] 66 M.J. 5 (C.A.A.F. 2008).

[23] *Id.* at 9.

[24] App. Ex. LXXVIII.

[25] *Id.* at 5-6.

would have been unnecessary."[26] We also find compelling that Appellant's presence at his residence was specifically requested by the NCIS agent, who presumed Appellant had his cell phone on his person, and Appellant was escorted from a mental health facility approximately 20 miles away to his residence an hour after being released from involuntary care.

The second, third, and fourth *Wallace* factors also favor Appellant. Contrary to the military judge's findings, the evidence supports that the atmospherics at the residence were both coercive and intimidating. The record reflects that upon his arrival at his residence Appellant observed numerous law enforcement personnel and according to the NCIS agent the Appellant was "clearly confused."[27] In *Wallace*, the court found that a coercive atmosphere clouded consent when there were three law enforcement officers present.[28] Here there were seven, and it is again worthy of noting that Appellant had just been subject to prolonged, involuntary mental health care an hour prior to arriving at the house. Upon his arrival, Appellant was immediately intercepted by NCIS, physically directed into the house, told to empty his pockets of his wallet and cell phone, and escorted to the kitchen where he was directed to take a seat. The NCIS agent and a civilian police detective explained that they were at the residence with a search warrant, which was presented to Appellant.[29] While the warrant did not authorize the search of Appellant's person, it did authorize the search and seizure of any cell phones found in the residence.

In this context, we find credible Appellant's testimony that when the PASS form was placed in front of him to review and sign, he regarded the search of his phone as a *fait accompli*, as opposed to having actual knowledge of his right to refuse consent. Nor does Appellant's release from involuntary mental health care provide basis to automatically conclude his mental state supported the voluntariness of his consent an hour later. Rather, when combined with the circumstances of the ongoing search into which he was intentionally transported, the fact that Appellant had just been released from a mental health ward weighs against voluntariness.

Regarding consultation, or lack thereof, with counsel, we agree with the military judge that Appellant was not afforded this opportunity; however,

---

[26] *Wallace*, 66 M.J. at 10.

[27] R. at 16.

[28] *Wallace*, 66 M.J. at 10.

[29] R. at 32, 43.

given the context, we find clearly unreasonable the military judge's determination that he did "not consider this factor present in this case or, at best, to be neutral in its analysis."[30] To the contrary, while not required by law, for a suspect escorted directly from a week-long, involuntary mental health stay to an ongoing search of his home by half a dozen law enforcement agents, we conclude Appellant's lack of consultation with counsel regarding whether to consent to a search of his cell phone weighs against voluntariness.

Finally, we find that the sixth *Wallace* factor applicable here insofar as it concerns the NCIS agent's conscious decision to insert Appellant and his cell phone into the residence at the time of the ongoing search. While it is permissible for officers executing a search warrant "to detain the occupants of the premises while a proper search is conducted" for purposes of officer safety, facilitating completion of the search, or preventing flight,[31] this rule only applies to occupants who are *already on the premises*. The Supreme Court specifically held in *Bailey v. United States*[32] that where an occupant of a premises subject to a search warrant is found in some remote place, law enforcement may not detain that individual and search him incident to the execution of the search warrant. The rationale behind the *Bailey* Court's decision is simple: where the occupant is far away from the situs of the search, the occupant presents no risk of interfering with the search, harming law enforcement, or fleeing haphazardly from the sight of the search. In other words, the reasons supporting detention incident to execution of a search warrant, as explained in *Summers*,[33] are non-existent.

Here, a similar reasoning drives our conclusion on this factor. Appellant was brought from an inpatient mental health ward 20 miles away, where he presented no risk whatsoever to the orderly execution of the search warrant and was certainly no danger to law enforcement personnel. He was brought to the situs of the search upon the request of NCIS, at which point he was asked to empty his pockets. To the extent law enforcement's request for him to empty his pockets was due to any concern for officer safety, that was brought about by NCIS's own doing, and the agents had no reason to believe, given where Appellant was coming from, that he possessed a weapon. Clearly, this action was not justifiable under *Bailey*. Moreover, it is compelling that

---

[30] *Id.* at 6.

[31] *Michigan v. Summers*, 452 U.S. 692, 705 (1981).

[32] 568 U.S. 186 (2013).

[33] 452 U.S. at 702-03.

the NCIS agent wrongfully created this "officer safety" concern apparently in an effort to obtain the cell phone Appellant had on his person at the time the search warrant was being executed at his residence. Thus, we find the sixth *Wallace* factor weighs in Appellant's favor and that the trial judge abused his discretion when he found this factor neutral or inapplicable.

For the reasons stated above, we disagree with the Government's reliance on *United States v. Olson*.[34] In *Olson*, the appellant consented to a search of her home after she was told to report to law enforcement spaces for an interview. The court held the consent voluntary because, among other things, the appellant "was not escorted to" or restrained at the situs of the interview and thus was free to leave; was not coerced or intimidated because law enforcement did not threaten or "bully" her; had "actual, not just inferential," knowledge of her right to refuse consent based on "some knowledge of law enforcement tactics;" had a mental state enabling her "to make a rational decision;" and while she "should have been advised of her rights" under Article 31(b), had not suffered any prior violations of her rights.[35] Recognizing that application of *Wallace* is highly fact-dependent, several important facts present here distinguish the instant matter from *Olson*. Appellant was escorted from involuntary mental health care 20 miles away to his residence, thrust into an ongoing search by seven law enforcement officers, directed to go inside and empty his pockets of his wallet and cell phone as a safety measure (which the NCIS agent created the need for by bringing him there), and then directed to sit in a chair in the kitchen, where he was shown a search warrant and presented a PASS form to sign. We find these facts distinguishable from the more typical "invitation" of a service member to an NCIS office for an interview presented in *Olson*.

### 2. Seizure of Cell Phone Pursuant to the Search Warrant

Because we have determined Appellant's consent to search his phone was not voluntary, we next look at whether the phone was lawfully obtained under the authority of the search warrant. Specifically, we examine whether law enforcement had the authority to search and seize the phone by virtue of Appellant, who had the phone in his pocket, being on the premises that was the subject of the warrant.

---

[34] 74 M.J. 132 (C.A.A.F. 2015).

[35] *Id*. at 132-35.

The search warrant authorized law enforcement to search for and seize items of evidentiary value from Appellant's residence, to include cell phones. It did not authorize a search of Appellant's person. The presumptive validity of the search warrant was not challenged at trial; however, both sides agreed the warrant only covered phones found inside the residence during the search. As discussed above, the record indicates that once the search of the home was underway, the NCIS agent requested that members of Appellant's command transport Appellant to the residence and was "pretty sure"[36] Appellant had his cell phone with him. Further, the NCIS agent testified that once Appellant was in the house he immediately conducted an "officer safety" search by asking Appellant to empty his pockets, which led to the discovery of the phone on his person.

As discussed above, we find the NCIS agent's action runs afoul of *Bailey*, wherein the Supreme Court held the detention of occupants beyond the immediate vicinity of the premises covered by a search warrant cannot be justified under *Michigan v. Summers*.[37] In *Summers* the Court recognized three important law enforcement interests that, taken together, justify the detention of an occupant who is on the premises during the execution of a search warrant: officer safety, facilitating the completion of the search, and preventing flight.[38] However, in *Summers* and later cases, the occupants detained were found on or immediately outside the premises at the time the police officers executed the search warrant, which is a requirement under the Court's subsequent holding in *Bailey*.

Here, Appellant was approximately 20 miles away when he was brought to the residence at the behest of NCIS. While it is not uncommon in the military to have a suspect transported to NCIS in order to conduct an interview (if, after being advised of his or her rights, the suspect elects to participate), here the intent was not to interview Appellant. Rather, it is clear from the record that the reason for having Appellant transported to the residence was to bring the cell phone to the situs of the search. Once there, Appellant was told to empty his pockets and then directed into the kitchen, where the phone became the sole focus of the interaction between law enforcement and Appellant.

---

[36] R. at 17.

[37] *Bailey*, 568 U.S. at 201-02.

[38] 452 U.S. at 702–03.

We conclude that obtaining the phone in this manner was unlawful under *Bailey.* As there is nothing in the record to indicate that Appellant was asked to, or did in fact, facilitate the search of his home, we find that when Appellant was brought to the residence by members of his command at the NCIS agent's behest, there was no valid reason to inject Appellant into the residence during the ongoing search other than to bring him and his phone into the purview of the warrant. As this is precisely the sort of governmental action that *Bailey* prohibits, we conclude that the phone was not lawfully obtained incident to the search warrant's authorization to search and seize evidence within Appellant's residence.[39]

### 3. Exclusion of the Cell Phone Evidence

Because we have determined that Appellant's consent was involuntary and the manner by which NCIS obtained the phone did not comport with *Bailey*,[40] we next examine whether "exclusion of the evidence results in appreciable deterrence of future unlawful searches or seizures and the benefits of such deterrence outweigh the costs to the justice system."[41] Here we find that exclusion of the evidence would result in appreciable deterrence and those benefits outweigh the costs to the justice system. Based on the specific facts of this case, there is significant deterrent value in not putting an imprimatur on the use of intimidating tactics to gain consent or strategic maneuvering to bring evidence into an exception to the Fourth Amendment. The cost to the justice system is *de minimis* by comparison, particularly where, as here, the governmental behavior appears to have been intentional as opposed to inadvertent. As such, we find that the military judge abused his discretion when he ruled that the evidence obtained from the search of the cell phone was admissible at trial pursuant to Mil. R. Evid. 311(a)(3).

---

[39] In addition, having concluded Appellant's consent to search was involuntary, we conclude that asking Appellant to provide the phone's passcode without first advising him of his right against self-incrimination was unlawful under *United States v. Mitchell.* 76 M.J. 413 (C.A.A.F. 2017); *see also United States v. Robinson*, 77 M.J. 303 (C.A.A.F. 2018) (holding that requesting a phone's passcode without rights advisement is lawful *if* voluntary consent to search the phone is first obtained).

[40] Nor does the evidence support the phone was lawfully obtained through any alternate basis, such the valid apprehension of a suspect based on probable cause or pursuant to a reasonable suspicion of criminal activity. *See Terry v. Ohio*, 392 U.S. 1 (1968); Mil. R. Evid. 314(f)(2) (allowing a frisk for weapons when, based on specific, articulable facts, a person is reasonably suspected to be armed and dangerous).

[41] Mil. R. Evid. 311(a)(3).

*4. Prejudice and Independent Source*

Having found error, we test for prejudice. "A constitutional error is harmless when it appears beyond a reasonable doubt that the error complained of did not contribute to the verdict obtained," meaning the error was "unimportant in relation to everything else the jury considered on the issue in question."[42]

Although we conclude the military judge abused his discretion in admitting the evidence found on the cell phone, we find beyond a reasonable doubt that its admission had no prejudicial effect on Appellant. The "independent source" doctrine permits the introduction of evidence initially discovered during, or as a consequence of, an unlawful search, but later obtained independently from lawful activities untainted by the initial illegality.[43] Such was the case here. Almost all of the same evidence found on the cell phone was lawfully obtained from an independent source: the laptop computer lawfully seized from Appellant's residence pursuant to the search warrant. At trial, along with the images and search terms from the phone, the military judge admitted into evidence the Government's forensic examination report of the laptop with the identical images and almost all the search terms found on the phone. The only evidence admitted that did not exist on both the phone and computer consisted of searches for "[Ms. William]," to include a specific search for "[Ms. William] naked," that occurred prior to the sexual assaults and indecent recording, as well as searches made the morning after the sexual assaults on Ms. William related to birth control and whether one could get pregnant on birth control. All the other evidence from the laptop computer, to include the digital penetration photo, contained metadata which showed the time and location where the photos were taken, as well as the device used to take them, all of which was consistent with Appellant taking the photos as he was committing the offenses.[44]

---

[42] *United States v. Hoffman*, 75 M.J. 120, 128 (C.A.A.F. 2016) (citation and internal quotation marks omitted); *see also* UCMJ art. 59(a), 10 U.S.C. § 859(a) (requiring error that "materially prejudices the substantial rights of the accused").

[43] *Murray v. United States*, 487 U.S. 533, 537-38 (1988).

[44] Because we conclude the "independent source" doctrine permitted the introduction of the majority of the evidence found on the cell phone, we forego further analysis regarding the potential that the "inevitable discovery" doctrine may also have allowed the introduction of the cell phone evidence. As our superior court has explained,

Based on the overwhelming body of evidence before the members, as discussed more fully below, we find beyond a reasonable doubt that the admission of search terms that existed only on the phone had no prejudicial effect on the members, such that they were "unimportant in relation to everything else the jury considered on the issue in question."[45]

## B. Prior Consistent Statements

Appellant asserts that the military judge erred when he admitted prior statements of Ms. Fox and Ms. William under Mil. R. Evid. 801(d)(1)(B). This Court reviews decisions to admit or exclude evidence for an abuse of discretion.[46] "The abuse of discretion standard is a strict one, calling for more than a mere difference of opinion. The challenged action must be arbitrary, fanciful, clearly unreasonable, or clearly erroneous."[47]

Generally, out-of-court statements offered to prove the truth of the matter asserted are considered hearsay and are inadmissible in courts-martial unless the evidentiary rules provide otherwise.[48] However, prior consistent statements made out of court are not hearsay and can be admitted as substantive evidence if the declarant testifies and is subject to cross-examination, the statement is consistent with the declarant's testimony, and the statement is offered "(i) to rebut an express or implied charge that the declarant recently fabricated it or acted from a recent improper influence or

---

The two doctrines, while similar, are separate exceptions to the exclusionary rule. The inevitable discovery rule is said to be a variation on the independent source rule. Thus, under the inevitable discovery rule, the question is not whether the police did in fact acquire certain evidence by reliance upon an untainted (or independent) source, but rather whether evidence found because of a Fourth Amendment violation would inevitably have been discovered lawfully.

*United States v. Eppes*, 77 M.J. 339, 347 (C.A.A.F. 2018) (citation omitted).

[45] *Hoffman*, 75 M.J. at 128.

[46] *United States v. Finch*, 79 M.J. 389, 394 (C.A.A.F. 2020) (citation and internal quotation marks omitted).

[47] *United States v. Lloyd*, 69 M.J. 95, 99 (C.A.A.F. 2010) (citations and internal quotation marks omitted).

[48] Mil. R. Evid 801(c); Mil. R. Evid. 802.

motive in so testifying; or (ii) to rehabilitate the declarant's credibility as a witness when attacked on another ground."[49]

### 1. Ms. Fox's Statements to Law Enforcement

After Ms. Fox testified during the Government's case-in-chief, Appellant's trial defense counsel cross-examined her about her memory of the incident and inconsistencies between her previous statements to law enforcement and her testimony on direct examination. Specifically, trial defense counsel questioned Ms. Fox about whether she told law enforcement that she heard Appellant unbuckle his own shorts and the sound of his pants coming down while in the bathroom. On redirect, the Government attempted to ask Ms. Fox if she told law enforcement that Appellant pulled down her shorts and underwear while in the bathroom. Trial defense counsel objected and the military judge found that, although Ms. Fox was not questioned by trial defense counsel about whether Appellant pulled down her shorts and underwear, it was permissible for Ms. Fox to answer the question under Mil. R. Evid 801(d)(1)(B)(ii) in order to rehabilitate Ms. Fox's credibility as a witness when attacked on another ground. The military judge found that because the trial defense attorney attacked the credibility of Ms. Fox with regard to whether she told law enforcement about *Appellant's* shorts, the Government was permitted to introduce her prior statement to law enforcement that Appellant pulled down *her* shorts for the limited purpose of rehabilitating her credibility under Mil. R. Evid. 801(d)(1)(B)(ii).

### 2. Ms. William's Statements after the Incidents

After the sexual assault, Ms. William petitioned the City of Virginia Beach for a civilian protective order against Appellant, where she was placed under oath and asked questions. At trial, after her testimony in the Government's case-in-chief, Appellant's trial defense counsel cross-examined her about the addition of facts to her testimony at trial that were not included in her testimony at the protective order hearing, implying Ms. William fabricated portions of her testimony at trial. After Ms. William's testimony, the Government called as a witness Construction Mechanic Third Class [CM3] Juliet, a former co-worker and roommate of Ms. William. Over trial defense counsel's objection, CM3 Juliet was permitted to testify about Ms. William's

---

[49] Mil. R. Evid. 801(d)(1)(B); s*ee also United States v. Norwood,* __ M.J. __, No. 20-0006, 2021 CAAF LEXIS 204, at *7 (C.A.A.F. Feb. 24, 2021) (citing *Finch,* 79 M.J. at 394-95).

statements to him about the sexual assaults approximately three weeks before the civilian protective order hearing that were consistent with her trial testimony. The military judge found that the testimony was permissible and could be admitted as a prior consistent statement to rebut the express or implied charge of recent fabrication, influence or motive under Mil. R. Evid. 801(d)(1)(B)(i) and to rehabilitate Ms. William's credibility as a witness when attacked on another ground under Mil. R. Evid. 801(d)(1)(B)(ii).

### 3. Analysis: The Prior Consistent Statements were Admissible

We find that the evidence was properly admitted. Ms. Fox's prior statement was admissible under Mil. R. Evid. 801(d)(1)(B)(ii). The declarant, Ms. Fox, testified and was subject to cross-examination about her prior statement to law enforcement about who pulled down her shorts, which was consistent with her testimony at trial. The military judge properly found that Ms. Fox's credibility as a witness was attacked on a ground other than recent fabrication or recent improper influence or motive when she was questioned about the differences between her statements to law enforcement and her testimony at trial, which challenged her memory—i.e., her recollection of the sexual assault. Finally, her prior statements about the assault were relevant to demonstrate that her memory about the incident was sound, as the important elements of her account remained the same over time.[50]

Ms. William's prior statements were also properly admitted under Mil. R. Evid. 801(d)(1)(B). Appellant challenged Ms. William's recollection of events under a theory that Ms. William was too intoxicated to remember what happened and therefore fabricated her statements and testimony during the investigation and that any testimony based on her recollection lacked credibility. Regarding the allegation of recent fabrication, the military judge took note that trial defense counsel's cross-examination of Ms. William focused on differences between her testimony at a civilian protective order hearing and her testimony at trial,[51] which implied that she developed a motive to fabricate sometime after the civilian hearing. The prior consistent statements that were admitted by the military judge were made to CM3 Juliet approximately three weeks before the civilian hearing. The statements were thus offered to rebut an express or implied charge of recent fabrication or improper motive

---

[50] *See generally United States v. Purcell*, 967 F.3d 159, 196-97 (2d Cir. 2020) (discussing the analogous Fed. R. Evid. 801(d)(1)(B)(ii) and approving use of the rule to rebut attacks on a declarant's credibility or memory).

[51] R. at 953-56.

and preceded any motive to fabricate or improperly influence, thus satisfying the requirements of Mil. R. Evid. 801(d)(1)(B)(i) and *United States v. Finch.*[52]

Additionally, Ms. William's prior statement was admissible under Mil. R. Evid. 801(d)(1)(B)(ii), which permits use of a prior consistent statement when a witness' credibility is attacked on grounds of faulty memory.[53] The declarant, Ms. William, testified and was subject to cross-examination about the prior statement, which was consistent with her testimony at trial. Ms. William's credibility as a witness was attacked on a ground other than recent fabrication or recent improper influence or motive when the Defense questioning sought to establish he had a faulty memory. The prior consistent statement thus served to rehabilitate her credibility on that ground by showing that her memory of the incident was not faulty, as the Defense maintained.

## C. The Military Judge Properly Excluded Appellant's Statements

Approximately a week after Ms. William reported the incidents, NCIS asked an acquaintance of Appellant, Ms. Mike, to wear a concealed recording device and to meet Appellant to record the interaction. Ms. Mike agreed, met with Appellant at a restaurant while wearing the "wire," and confronted Appellant with Ms. William's accusation of sexual assault. The conversation occurred several days after an earlier interaction between Appellant and Ms. Mike at Appellant's house, where Appellant was "frantic" and told Ms. Mike that Ms. William accused him of rape.

At trial, on cross-examination, Appellant's trial defense counsel asked Ms. Mike about her conversation with Appellant at the restaurant, including asking, "And he didn't confess to you, did he?"[54] The Government objected and the military judge sustained the objection on the grounds of hearsay. On appeal, Appellant argues the military judge erred because Appellant's response to the question would have been admissible as an "excited utterance."

We find no error in the exclusion of this evidence. First, the military judge properly concluded that Appellant's response to the question was hearsay, as it was being offered to prove the truth of the matter asserted. Second, the evidence did not constitute an excited utterance, which is an exception to the

---

[52] 79 M.J. at 394.

[53] *See, e.g., United States v. Cox,* 871 F.3d 479, 487 (6th Cir 2017).

[54] R. at 1117.

rule against hearsay.[55] A statement must satisfy three criteria to be an excited utterance: "(1) the statement must be spontaneous, excited, or impulsive rather than the product of reflection and deliberation; (2) the event prompting the utterance must be startling; and (3) the declarant must be under the stress of excitement caused by the event."[56]

Appellant's statement fails to satisfy these criteria. The restaurant conversation occurred over a week after Appellant was accused of sexual assault and several days after the earlier interaction between Appellant and Ms. Mike at Appellant's house where Appellant was "frantic" and told Ms. Mike that Ms. William accused him of rape. Thus, any response by Appellant to Ms. Mike's question at the restaurant was the product of reflection and deliberation, as opposed to being spontaneous, excited, or impulsive. Assuming the startling event was Ms. William's allegation of assault, Appellant had several days to digest the allegation by the time of the conversation that occurred between Appellant and Ms. Mike at the restaurant, such that he was no longer under the stress of any excitement caused by the allegation.[57] Nor is there evidence that the conversation itself was "startling," which took place over lunch between friends. Accordingly, we conclude the hearsay exception for excited utterances does not apply.

### D. Ineffective Assistance of Counsel

At trial, Appellant's civilian defense counsel attempted to question Ms. Fox about mental health treatment she received at the hospital after reporting the assault. Ms. Fox testified on cross-examination that she was placed on "psych hold" during her stay at the hospital.[58] When asked whether she received antipsychotic medication, Ms. Fox denied that she had. At that point, the trial counsel objected to trial defense counsel's line of questioning on relevance grounds. During an Article 39(a), UCMJ session, trial defense counsel told the court he had a good faith basis to believe Ms. Fox had been prescribed antipsychotic medication; however, the military judge noted there was no evidence the medication was prescribed prior to Ms. Fox's statements to authorities about the sexual assault. In response, Appellant's counsel

---

[55] Mil. R. Evid. 803(2).

[56] *United States v. Feltham*, 58 M.J. 470, 474 (C.A.A.F. 2003) (citations omitted).

[57] *Id.*; *cf. United States v. Grant*, 42 M.J. 340, 343 (C.A.A.F. 1995) (finding no excited utterance after two days).

[58] R. at 606.

conceded that the evidence was not relevant and did not pursue the issue. The military judge instructed the members to disregard Ms. Fox's answer to the question regarding whether she was prescribed anti-psychotic medication.

Appellant asserts that his trial defense counsel's concession regarding Ms. Fox's mental health treatment constitutes ineffective assistance of counsel. He also asserts his trial defense counsel were ineffective when they failed to move to admit the above-described statements by Appellant to Ms. Mike, denying that he sexually assaulted Ms. William, under the residual hearsay rule. We review claims of ineffective assistance of counsel de novo.[59]

Our review uses the two-part test outlined in *Strickland v. Washington.*[60] "In order to prevail on a claim of ineffective assistance of counsel, an appellant must demonstrate both (1) that his counsel's performance was deficient, and (2) that this deficiency resulted in prejudice."[61] Our review "must indulge a strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance."[62] When an ineffective assistance of counsel claim is premised on trial defense counsel's failure to move the court to take some action, "an appellant must show that there is a reasonable probability that such a motion would have been meritorious."[63] "Failure to raise a meritless argument does not constitute ineffective assistance."[64]

With respect to whether the deficiency resulted in prejudice, an accused "must show that there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different. A reasonable probability is a probability sufficient to undermine confidence in the outcome."[65] The two-prong approach laid out in *Strickland* is not a sequential test. We need not always determine "whether counsel's perfor-

---

[59] *United States v. Mazza*, 67 M.J. 470, 474 (C.A.A.F. 2009) (citations omitted).

[60] 466 U.S. 668, 687 (1984).

[61] *United States v. Green*, 68 M.J. 360, 361-62 (C.A.A.F. 2010) (citing *Strickland*, 466 U.S. at 687).

[62] *Strickland*, 466 U.S. at 689.

[63] *United States v. McConnell*, 55 M.J. 479, 482 (C.A.A.F. 2001) (citation and internal quotation marks omitted).

[64] *United States v. Napoleon*, 46 M.J. 279, 284 (C.A.A.F. 1997) (quoting *Boag v. Raines*, 769 F.2d. 1341, 1344 (9th Cir. 1985)).

[65] *Strickland*, 466 U.S. at 694.

mance was deficient before examining the prejudice suffered by the [Appellant] as a result of the alleged deficiencies. If it is easier to dispose of an ineffectiveness claim on the ground of lack of sufficient prejudice, . . . that course should be followed."[66]

We find Appellant's trial defense counsel were not ineffective in this case. With regard to the decision to concede the objection regarding Ms. Fox's mental health treatment, this court "will not second guess the strategic or tactical decisions made at trial by defense counsel."[67] "Defense counsel do not perform deficiently when they make a strategic decision to accept a risk or forego a potential benefit, where it is objectively reasonable to do so."[68] We find it was objectively reasonable for trial defense counsel to avoid the risk or forego the potential benefit of further inquiry into Ms. Fox's mental health history. The evidence regarding whether Ms. Fox was prescribed anti-psychotic medication after the incident was irrelevant. There is no evidence in the record that Ms. Fox received any mental health diagnosis or treatment prior to her statements to law enforcement about the incident, or that she was on medication at the time of the incident. Appellant relies on *United States v. Eshalmi*[69] to argue that records of psychiatric treatment are relevant when they can be used to challenge an alleged sexual assault victim's perception of the sexual encounter; however, such reliance is inapposite where the record contains no evidence of a diagnosis or treatment that preceded either the incident or the report.[70]

We further conclude Appellant's trial defense counsel were not ineffective in failing to assert the residual hearsay exception as a basis to admit Appellant's statements to Ms. Mike at the restaurant because the evidence was inadmissible on that basis. A statement may be admitted as residual hearsay when:

> (1) the statement has equivalent circumstantial guarantees of trustworthiness [to those found in Mil. R. Evid. 803 or 804];
> (2) it is offered as evidence of a material fact; (3) it is more pro-

---

[66] *Id.* at 689.

[67] *United States v. Paxton*, 64 M.J. 484, 489 (C.A.A.F. 2007).

[68] *United States v. Datavs*, 71 M.J. 420, 424 (C.A.A.F. 2012).

[69] 23 M.J. 12, 20 (CMA 1986).

[70] *See United States v. Sullivan*, 70 M.J. 110, 116 (CAAF 2011) (affirming the exclusion of evidence about medication history where "there was no evidence on the record that showed [the victim] was on medication at the time of the incident").

bative on the point for which it is offered than any other evidence that the proponent can obtain through reasonable efforts; and (4) admitting it will best serve the purposes of these rules and the interests of justice.[71]

The residual hearsay exception thus has three criteria: "(1) materiality, (2) necessity, and (3) reliability."[72] It is to "be used very rarely and only in exceptional circumstances."[73]

While Appellant's answer to Ms. Mike's question may have been material, it was not sufficiently reliable because it lacked circumstantial guarantees of trustworthiness equivalent to those found in Mil. R. Evid. 803 and 804. We agree with the Government that Appellant's implicit denial of sexual assault allegations several days after first hearing about them is precisely the kind of out-of-court statement the rule against hearsay is designed to prevent. As there existed a strong motive to fabricate a response to Ms. Mike's question, this case is distinguishable from *People v. Julian,*[74] cited by Appellant, in which the statement was an admission of guilt rather than a proclamation of innocence. For much the same reasons we have determined the excited-utterance exception under Mil. R. Evid. 803(2) does not apply, the circumstances here do not lend themselves to circumstantial guarantees of trustworthiness equivalent to those found in Mil. R. Evid. 803 or 804. Additionally, the statements were not more probative on the point for which they were offered than any other evidence Appellant could obtain through reasonable efforts. Indeed, Appellant's denial of the accusations was already in evidence when earlier in the trial Ms. Mike testified that Appellant told her Ms. William consented to the sexual acts.[75] Thus, even assuming the statements were admissible, Appellant's trial defense counsel did not perform deficiently because it was objectively reasonable not to pursue admission of the evidence in light of the previous testimony.

---

[71] Mil. R. Evid. 807.

[72] *United States v. Kelley*, 45 M.J. 275, 280 (C.A.A.F. 1996).

[73] *United States v. Czachorowski*, 66 M.J. 432, 435 n.6 (C.A.A.F. 2008) (quoting S. Rep. No. 93-1277 (1974), *reprinted in* 1974 U.S.C.C.A.N. 7051, 7066).

[74] 2012 Mich. App. LEXIS 2332 (Ct. App. Nov. 27, 2012).

[75] R. at 1085-86.

**E. Appellant's Convictions are Legally and Factually Sufficient**

Appellant was convicted of three specifications of sexual assault, and one specification of indecent visual recording in violation of Articles 120 and 120c, UCMJ.[76] Appellant contests the factual sufficiency of his convictions. Although he does not challenge the legal sufficiency of these charges, we are mindful that Article 66(c), UCMJ, requires this court "to conduct a de novo review of [both the] legal and factual sufficiency of the case."[77]

To determine legal sufficiency, we ask whether, "considering the evidence in the light most favorable to the prosecution, a reasonable fact-finder could have found all the essential elements beyond a reasonable doubt."[78] In conducting this analysis, we must "draw every reasonable inference from the evidence of record in favor of the prosecution."[79]

In evaluating factual sufficiency, we determine whether, after weighing the evidence in the record of trial and making allowances for not having observed the witnesses, we are convinced of Appellant's guilt beyond a reasonable doubt.[80] In conducting this unique appellate function, we take "a fresh, impartial look at the evidence," applying "neither a presumption of innocence nor a presumption of guilt" to "make [our] own independent determination as to whether the evidence constitutes proof of each required element beyond a reasonable doubt."[81] Proof beyond a "[r]easonable doubt, however, does not mean the evidence must be free from conflict."[82]

*1. Violations of Article 120(b)(1)(B)*

The non-consensual sexual acts Appellant was convicted of were digitally penetrating Ms. Fox, digitally penetrating Ms. William, and penetrating Ms. William with his penis. In order to sustain the convictions for sexual assault by digital penetration, the Government must have proven beyond a reasonable doubt that: (1) Appellant committed a sexual act (penetration of

---

[76] 10 U.S.C. §§ 920(b), 920(c) (2016).

[77] *United States v. Washington*, 57 M.J. 394, 399 (C.A.A.F. 2002).

[78] *United States v. Turner*, 25 M.J. 324, 324-25 (C.M.A. 1987) (citing *Jackson v. Virginia*, 443 U.S. 307, 319 (1979)).

[79] *United States v. Gutierrez*, 74 M.J. 61, 65 (C.A.A.F. 2015).

[80] *Turner*, 25 M.J. at 325.

[81] *Washington*, 57 M.J. at 399.

[82] *United States v. Rankin,* 63 M.J. 552, 557 (N-M. Ct. Crim. App. 2006).

the vulva by Appellant's finger) upon Ms. Fox and Ms. William; (2) he did so by causing them bodily harm, i.e., without their consent; and (3) he did so with the intent to abuse, humiliate, harass, degrade or arouse or gratify the sexual desire of any person.[83] In order to sustain the conviction for sexual assault by penile penetration the Government must have proven beyond a reasonable doubt that: (1) Appellant committed a sexual act (penetration of the vulva by his penis) upon Ms. William; and (2) he did so by causing bodily harm, i.e., without her consent. The Government was also required to prove beyond a reasonable doubt that the defense of mistake of fact as to consent did not apply.

Regarding Appellant's sexual assault of Ms. Fox by digital penetration, the evidence introduced at trial included Appellant's highly incriminating admissions to law enforcement, medical personnel and his brother. Ms. Fox's testified that she did not consent to the sexual act and, consistent with her prior statements, that after vomiting she was on her knees with her head over the toilet when Appellant came up behind her and penetrated her vulva with his finger. With respect to Ms. Fox's subsequent mental health treatment, based upon our review of the record we reject any argument that the treatment raises a basis to question Ms. Fox's veracity to the degree necessary to set aside the conviction. Nor is Appellant's claim of mistake of fact supported by the record, even taking into account evidence of his intoxication at the time. Similar to the facts in *United States v. Guin,*[84] the record shows no interaction or conversation between Appellant and Ms. Fox that indicated an invitation or agreement by Ms. Fox to engage in sexual activity with Appellant. To the contrary, there evidence supports that Ms. Fox did not have any existing or prior romantic interest in Appellant and had, in fact, expressed romantic interest in Appellant's brother.

Regarding Appellant's sexual assaults of Ms. William by means of digital and penile penetration, two photos were entered into evidence that were found on Appellant's laptop computer. The first photo depicts a male finger penetrating a vagina. The second photo shows what appears to be an image of Ms. William asleep, wearing a bra and no underwear. The evidence established that the photos were taken approximately an hour after Ms. William testified she fell asleep and were transferred to his computer early the next morning. Ms. William testified that she woke up while Appellant was pene-

---

[83] *Manual for Courts-Martial, United States* [*MCM*], pt. IV, para. 45.b.(4)(b) (2016 ed.).

[84] 75 M.J. 588 (N-M. Ct. Crim. App. 2016) (unpublished).

trating her with his penis, froze, and then pretended to be asleep as he ejaculated, cleaned her with baby wipes, put underwear on her, and then went to work. When she confronted him about his actions via digital message, he did not challenge her claims and stated her understood her desire not to see him again. She further testified that when she woke up, she had no idea she had been digitally penetrated (or that Appellant had photographed it). She testified she did not consent to either sexual act. This evidence supports a finding of guilty as to both incidents, notwithstanding evidence that Ms. William was intoxicated on the evening the acts occurred and Appellant's statement to Ms. Mike that Ms. William had a history of having consensual relations with him and then forgetting because of her intoxication.

We conclude a reasonable factfinder could have found all the essential elements of all three offenses beyond a reasonable doubt. Further, having reviewed the entirety of the record and after weighing the evidence anew, making allowances for not having personally observed the witnesses, we too are convinced beyond reasonable doubt of Appellant's guilt.

*2. Violation of Article 120(c)*

In order to sustain the conviction for indecent visual recording the Government must have proven beyond a reasonable doubt that: (1) Appellant knowingly recorded the private area of Ms. William; (2) the recording was done without Ms. William's consent; and (3) the recording was made under circumstances in which Ms. William had a reasonable expectation of privacy.[85] As noted above, the evidence supporting this charge included time-stamped photographs from Appellant's laptop that showed Ms. William asleep on a bed and being digitally penetrated, which corroborated Ms. William's testimony that she was unaware of and did not consent to the sexual act.

We conclude a reasonable factfinder could have found all the essential elements of this offense beyond a reasonable doubt. Further, having reviewed the entirety of the record and after weighing the evidence anew, making allowances for not having personally observed the witnesses, we too are convinced beyond reasonable doubt of Appellant's guilt.

---

[85] *MCM,* pt. IV, para. 45c.b.(2).

## III. CONCLUSION

The findings and sentence are **AFFIRMED.**

Senior Judge GASTON and Judge STEWART concur.

FOR THE COURT:

RODGER A. DREW, JR.
Clerk of Court